**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 18, 2025

S24A0887. DIAS v. BOONE.

PETERSON, Presiding Justice.

This case presents the question of the constitutionality of OCGA § 19-7-3.1, known as the Equitable Caregiver Statute. Under that statute, a person who is not a legal parent of a child may seek rights such as custody or visitation with the child if he or she proves that certain criteria have been met, including that he or she has undertaken a "parental" role with the child and developed a "bonded and dependent" relationship with the child that "was fostered or supported by a parent of the child[.]" OCGA § 19-7-3.1 (d). In this case, a woman who had been in a long-term romantic relationship with a child's legal mother successfully sought relief under the statute after the couple broke up, securing an award of joint legal custody and parenting time. The child's mother has challenged (1)

the constitutionality of the statute (both facially and as applied to this case) and (2) the sufficiency of the evidence to support the trial court's order.

We deem it unnecessary to resolve either argument. This case raises serious questions about whether the Equitable Caregiver Statute violates the fundamental right of parents to the care, custody, and control of their children. A possible answer to those questions is that parents may waive their constitutional right at least in some limited fashion through the sort of conduct contemplated by the statute. But only a knowing and voluntary waiver would suffice, and parental conduct prior to the effective date of the statute could not constitute such a knowing and voluntary waiver. Such an application of the statute also would be in tension with constitutional presumptions against retroactive legislation. And so, based on both the doctrine of constitutional avoidance and those presumptions against retroactivity, we conclude as a matter of statutory construction that OCGA § 19-7-3.1 does not authorize trial courts to confer equitable caregiver status based on conduct by

2

the legal parent that took place prior to the effective date of the statute. And so we reverse.

1.  *Background*

The child at issue, "M.D.," was born in October 2010. Appellant Michelle Dias, whose cousin gave birth to M.D., and Dias's romantic partner, Appellee Abby Boone, began caring for M.D. when M.D. was six weeks old. Dias adopted M.D. in March 2011; Boone was not a party to the adoption, but "Boone" was listed as the child's new middle name on the post-adoption birth certificate. Several years later, the couple broke off their romantic relationship. Boone continued to be involved in M.D.'s life after the breakup until 2018, when Dias stopped further contact between Boone and M.D.

Boone filed an action in superior court seeking equitable caregiver status under OCGA § 19-7-3.1 in August 2019, one month after the new statute became effective. The statute provides that a court may "adjudicate an individual to be an equitable caregiver." OCGA § 19-7-3.1 (a). It provides both procedural and substantive requirements for an individual to establish "standing to maintain

3

the action" to be adjudicated as an equitable caregiver. See OCGA § 19-7-3.1 (b), (d). In order to establish standing, the individual seeking equitable caregiver status must establish by clear and convincing evidence each of five statutory prerequisites, showing that that he or she has:

(1) Fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life;
(2) Engaged in consistent caretaking of the child;
(3) Established a bonded and dependent relationship with the child, which relationship was fostered or supported by a parent of the child, and such individual and the parent have understood, acknowledged, or accepted that or behaved as though such individual is a parent of the child;
(4) Accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and
(5) Demonstrated that the child will suffer physical harm or long-term emotional harm and that continuing the relationship between such individual and the child is in the best interest of the child.

OCGA § 19-7-3.1 (d). The statute also sets forth factors that the court "shall consider" "[i]n determining the existence of harm[.]" OCGA § 19-7-3.1 (e). But, as discussed further below, the statute does not specify what circumstances must be the source of that harm

4

for that criterion to be satisfied. The statute provides that "[t]he court may enter an order as appropriate to establish parental rights and responsibilities for such individual" — presumably, someone "adjudicated" as an equitable caregiver — "including, but not limited to, custody or visitation." OCGA § 19-7-3.1 (g).

In her lawsuit, Boone sought joint physical and legal custody of and parenting time with M.D. In September 2019, Dias filed a motion to dismiss. The trial court held a hearing at which Dias's counsel stated that there was sufficient evidence for Boone to make a prima facie showing as to all of the requirements for equitable caregiver standing except for the fifth, which addresses the issue of harm to the child, saying there was "no real question of fact" except for the harm issue. The trial court issued an order granting Boone's "request for determination of prima facie case for standing" and reserving ruling on Dias's motion to dismiss.

Dias later filed another motion styled as a "Motion for Declaratory Judgment/Motion to Dismiss and Brief in Support." Dias argued that OCGA § 19-7-3.1 was unconstitutional, because it

5

does not sufficiently protect a parent's fundamental right under the federal and state constitutions to the care, custody, and control of her child.[1] Although Dias's motion was not explicit as to whether her constitutional challenge to the statute was facial or as-applied, the parties at the hearing appeared to treat it as both, and the trial court's order characterized the challenge as both facial and as-applied. The trial court denied the motions to dismiss and for declaratory judgment.[2] The case proceeded to a four-day trial in March 2023. The pre-trial order entered in the case included a number of stipulations by the parties, including that Dias "fostered and supported the relationship" between M.D. and Boone until January 2018 but Boone "has not seen or spoken to (other than from a distance or in passing) this child" since February 2018.

---

[1] Dias invited the trial court to delay a trial or ruling on the motion until this Court issued a ruling in *McAlister v. Clifton*, a similar case pending before this Court at the time. But this Court soon issued an opinion in *McAlister* concluding that a parent's challenge to the constitutionality of OCGA § 19-7-3.1 was moot in that case because the child at issue had turned 18 prior to the docketing of the appeal. See *McAlister v. Clifton*, 313 Ga. 737, 738-742 (1) (873 SE2d 178) (2022).

[2] This Court declined to grant an interlocutory application seeking review of that order.

6

On August 10, 2023, the trial court issued a lengthy order granting Boone's request for standing as an equitable caregiver. After recounting the various evidence and stipulations about Boone's history of caregiving for and relationship with M.D., the trial court found that Boone had "presented clear and convincing evidence that [M.D.] will suffer long-term emotional harm, and that continuing the relationship between [M.D.] and [Boone] is in [M.D.]'s best interest." In particular, the trial court found that around February 2018 Dias had "intentionally, unilaterally, and without regard for [M.D.]'s well-being, severed a bonded relationship between [M.D.] and [Boone]." The trial court found that "any severance of an established, bonded, and dependent relationship between [M.D.] and [Boone], who acted in the role of parent from the time [M.D.] was just 6 weeks old, inherently causes long-term emotional harm and was not in [M.D.]'s best interest in January 2018, today, or in the future." In the August 2023 order, the trial court declared that Boone's "request for standing as an equitable caregiver is hereby **GRANTED** with all the rights and

7

responsibilities as contemplated by Georgia law." The trial court provided for some written communication between Boone and M.D. and ordered that therapy for the child with a new therapist chosen by the guardian ad litem to "assist with the future process of reunification and any other issues related to this matter" should begin immediately. But, referencing the parties' expressed desire to appeal any adverse ruling, the trial court explained that its intent was "that the stability of [M.D.] is not to be further disrupted by beginning a reunification process and visitation schedule with petitioner if this Court's decision is ultimately reversed on appeal." The trial court concluded by stating that it "**RESERVES** ruling on all other pertinent issues until such time as the period to appeal this Order has passed, or the Court of Appeals or other higher Court renders its decision in this matter, whichever occurs first." Dias's notice of appeal of this order was dismissed by this Court in December 2023 on the ground that the order was a non-final order and Dias had failed to follow the interlocutory application procedures.

On remand in January 2024, the trial court issued a new order. The court's new order reiterated that Boone "is granted equitable caregiver status" and stated that "it is in [M.D.]'s best interest to have petitioner as a caregiver in her life, and that any further delay in reunification than what has already occurred during the many years this case has remained pending could only cause M.D. additional harm." The trial court ordered the parties to follow an incorporated parenting plan that provided for joint legal custody, with Dias as the primary physical custodian. The parenting plan provided a graduated parenting time schedule that gave increasing amounts of visitation to Boone over time. The trial court also ordered that each party was solely responsible for her own attorney's fees.

Dias has appealed the trial court's January 2024 order. We held oral argument in the case on October 22, 2024, and ordered supplemental briefing from the parties on multiple issues.[3]

2. *This Court has jurisdiction over this case notwithstanding*

---

[3] Amicus briefs were filed by Nathan Hartman, the National Association of Parents, Inc., d/b/a ParentsUSA, and Glenn Memorial United Methodist Church.

*that Dias did not file an application for discretionary appeal.*

We first address a jurisdictional issue raised not by the parties[4] but by a recent decision of the Court of Appeals in another case brought under the Equitable Caregiver Statute. "It is incumbent upon this Court, even when not raised by the parties, to inquire into its own jurisdiction." *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Community Trust*, 298 Ga. 221, 223 (1) (a) (780 SE2d 311) (2015) (citation and punctuation omitted). The Court of Appeals recently in a published opinion dismissed for failure to file a discretionary application an appeal of an order granting equitable caregiver status and joint legal and physical custody of two children to their father's former romantic partner. See *Hartman v. De Caro*, 371 Ga. App. 578 (901 SE2d 204) (2024) (cert. pending, Case No.

---

[4] Although Boone did not contest this Court's appellate jurisdiction over this appeal in her primary brief or in any motion to dismiss filed with this Court, she did argue in supplemental briefing ordered by the Court that the appeal is subject to dismissal due to Dias's failure to file an application for discretionary appeal. We note that this case was properly appealed to this Court instead of the Court of Appeals because Dias raises a novel constitutional challenge to a statute. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1).

S24C1257). The Court of Appeals's theory of dismissal was that an appeal from an order granting equitable caregiver status was an appeal from an order in a "domestic relations case" that must be pursued through the discretionary application process under OCGA § 5-6-35 (a) (2). See id. at 578-579.

That decision appears to be contrary to recent practice by both this Court and the Court of Appeals, albeit in cases in which the appellate court did not address in its opinion why no discretionary application was required. See *McAlister v. Clifton*, 313 Ga. 737 (873 SE2d 178) (2022); *McDonald v. Reyes*, 365 Ga. App. 317 (878 SE2d 79) (2022); *Skinner v. Miles*, 361 Ga. App. 764 (863 SE2d 578) (2021); *Teasley v. Clark*, 361 Ga. App. 721 (865 SE2d 556) (2021). But more importantly, we conclude that the Court of Appeals's decision to dismiss the appeal in *Hartman* was incorrect.

Even where a judgment or order is subject to an immediate appeal under OCGA § 5-6-34 (a), if the underlying subject matter is listed in OCGA § 5-6-35 (a), a party must follow the discretionary application process in order to appeal immediately. See *Grogan v.*

*City of Dawsonville*, 305 Ga. 79, 82 (2) (823 SE2d 763) (2019); *Rebich v. Miles*, 264 Ga. 467, 468 (448 SE2d 192) (1994). OCGA § 5-6-34 (a) (11) provides that appeals may be taken from "[a]ll judgments or orders in child custody cases awarding, refusing to change, or modifying child custody or holding or declining to hold persons in contempt of such child custody judgment or orders[.]" The January 2024 order in this case awards joint legal custody to Boone, so Dias did not need to follow the interlocutory appeal procedures of OCGA § 5-6-34. See *Grogan*, 305 Ga. at 82-83 (2).[5] But OCGA § 5-6-35 (a) (2) provides that "[a]ppeals from judgments or orders in divorce, alimony, and other domestic relations cases including, but not limited to, granting or refusing a divorce or temporary or permanent alimony or holding or declining to hold persons in contempt of such alimony judgment or orders" must come by discretionary application. In *Hartman*, the Court of Appeals started with the premise that any case filed under the Equitable Caregiver Statute

---

[5] We express no opinion as to whether the January 2024 order — which purported to resolve all remaining issues in the case — may also be a final judgment under OCGA § 5-6-34 (a) (1).

12

is a "domestic relations case" and thus any order entered in such a case presumptively falls under OCGA § 5-6-35 (a) (2):

> Generally, appeals from orders in "domestic relations cases" must be pursued through an application for discretionary appeal. OCGA § 5-6-35 (a) (2). The equitable caregiver statute, OCGA § 19-7-3.1, falls under the "domestic relations" statutory scheme. See OCGA § 19-7-3.1; see also *Teasley v. Clark*, 361 Ga. App. 721, 724 (4) (865 SE2d 556) (2021) (the equitable caregiver statute is a domestic relations statute). Thereby, an appeal of an order in an equitable caregiver matter must be filed through an application for discretionary appeal.

*Hartman*, 371 Ga. App. at 578. But orders in cases brought under the Equitable Caregiver Statute are not "domestic relations cases" under OCGA § 5-6-35 (a) (2).

Although OCGA § 5-6-35 (a) (2) refers to "other domestic relations cases," "[i]t is important to remember that when we determine the meaning of a particular word or phrase in a constitutional provision or statute, we consider text in context, not in isolation." *Kinslow v. State*, 311 Ga. 768, 773 (860 SE2d 444) (2021) (citation and punctuation omitted). In particular, under the canon of noscitur a sociis, the phrase "other domestic relations

13

cases" must be understood in relation to the other words in OCGA § 5-6-35. See id. (explaining that under the canon of noscitur a sociis, a word must be understood in relationship to other words in a statute, and we normally should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to an act of the General Assembly" (citation and punctuation omitted)). And the canon of ejusdem generis counsels us to read "other domestic relations cases" narrowly:

> When a statute or document enumerates by name several particular things, and concludes with a general term of enlargement, this latter term is to be construed as being ejusdem generis[,] i.e., of the same kind or class[,] with the things specifically named, unless, of course, there is something to show that a wider sense was intended.

Id. at 775 (citation and punctuation omitted). "[C]ourts typically use ejusdem generis to ensure that a general word will not render specific words meaningless." Id. (citation and punctuation omitted); see also Matthew P. Cavedon, "Georgia's Law of Rules: Textualism and a Survey of the Canons," 76 Mercer L. Rev. 1, 38-39 (2024).

14

Applying these key canons of construction to OCGA § 5-6-35 (a) (2), we conclude that the phrase "other domestic relations cases" as used in that provision does not refer to family-law cases generally, even if the phrase might be used in that more general sense in other contexts. Compare *Teasley*, 361 Ga. App. at 724 (4) (referring to the Equitable Caregiver Statute as a "domestic relations statute" in determining that it imposes no duty on the trial court to issue specific findings of fact in support of its rulings). Rather, as used in OCGA § 5-6-35 (a) (2), the phrase "other domestic relations cases" refers specifically to cases *like* divorce and alimony cases, and the orders covered by OCGA § 5-6-35 (a) (2) are orders *like* orders "granting or refusing a divorce or temporary or permanent alimony or holding or declining to hold persons in contempt of such alimony judgment or orders[.]" Other than being generally in the realm of family law, an order issued under the Equitable Caregiver Statute — whether merely granting "standing" to a putative equitable caregiver, or granting particular custody or visitation rights — is nothing like an order "granting or refusing a divorce or temporary

15

or permanent alimony" or a related contempt order. OCGA § 5-6-35 (a) (2). The Equitable Caregiver Statute requires no particular kind of relationship between the adults involved but speaks only to the adults' relationship with a particular child. Indeed, the parties in this case were never married at all, and the order at issue here is not so much about their relationship with one another as their relationships with M.D.

Even to the extent that OCGA § 5-6-35 (a) (2)'s reference to "other domestic relations cases" is a phrase that might in the abstract be broad enough to include cases brought under the Equitable Caregiver Statute, the statutory history makes clear that an order like the one here is not included within that provision. The remedy available through the Equitable Caregiver Status is, per the language of the statute, "to establish parental rights and responsibilities for" the equitable caregiver "including, but not limited to, custody or visitation." OCGA § 19-7-3.1 (g).[6] And the

---

[6] As we have explained, a "change in visitation amounts to a change in custody in legal contemplation since visitation rights (sometimes called

16

General Assembly in 2007 specifically removed "[a]ppeals from judgments or orders in . . . child custody . . . cases including, but not limited to, . . . awarding or refusing to change child custody" from the language of OCGA § 5-6-35 (a) (2). See Ga. L. 2007, pp. 554-556, §§ 2-3; *Todd v. Todd*, 287 Ga. 250, 250 (1) (703 SE2d 597) (2010); *In re K.R.*, 285 Ga. 155, 155-156 (674 SE2d 288) (2009).[7] We presume that such a legislative change to the language of the statute changed the meaning of the statute. See *Allen v. State*, 319 Ga. 415, 419 (2) n.6 (902 SE2d 615) (2024) ("When the General Assembly changes the language of a statute, that typically signals an intent to change the meaning of the statute."). And the obvious change in meaning here was to remove appeals from "child custody cases" and orders "awarding or refusing to change child custody" from the category of orders and judgments that OCGA § 5-6-35 (a) (2) requires a

---

visitation privileges) are a part of custody." *Facey v. Facey*, 281 Ga. 367, 369 (2) (638 SE2d 273) (2006) (citation and punctuation omitted).

[7] At the same time, the General Assembly added the OCGA § 5-6-35 (a) (12) provision requiring discretionary applications for "[a]ppeals from orders terminating parental rights[,]" and added the OCGA § 5-6-34 (a) (11) provision authorizing direct appeal of "judgments or orders in child custody cases[.]" See Ga. L. 2007, pp. 554-556, §§ 2-3.

discretionary application to appeal. See *Moore v. Moore-McKinney*, 297 Ga. App. 703, 707 (1) (678 SE2d 152) (2009) ("The logical conclusion to be drawn from these [2007] changes to pre-existing law is that the legislature intended for child custody cases to be treated differently from other domestic relations cases for purposes of appeals. Accordingly, we find that it was the intent of the General Assembly to remove child custody cases from the operation of OCGA § 5-6-35 (a) (2) when it excised references to such cases from the statute. To rule otherwise would be to ignore the apparent intent of the legislature while affording no practical effect to its 2007 amendment of OCGA § 5-6-35 (a) (2).").

In *Hartman*, as noted above, the Court of Appeals assumed that orders issued under the Equitable Caregiver Statute were orders in "domestic relations cases" under OCGA § 5-6-35 (a) (2). See 371 Ga. App. at 578. The *Hartman* court also cited OCGA § 5-6-34 (a) (11), which provides that no interlocutory application is required to appeal "judgments or orders in child custody cases." See id. Based on the assumption that OCGA § 5-6-35 (a) (2) generally required

18

that an appeal of an order in a case filed under the Equitable Caregiver Statute must be brought by an application for discretionary appeal, the Court of Appeals in *Hartman* relied on case law to the effect that whether a discretionary application is required to appeal an order in the *divorce* context in which custody is at issue turns on whether the custody determination in the order at issue is merely "ancillary" to the primary issue in the case, i.e., whether a marriage should be dissolved. See id. at 579 (citing *Hoover v. Hoover*, 295 Ga. 132, 134 (1) (757 SE2d 838) (2014); *Todd*, 287 Ga. at 251 (1)); see also *Voyles v. Voyles*, 301 Ga. 44, 45-46 (799 SE2d 160) (2017) (noting that "even if the appeal arises from the type of order specified in OCGA § 5-6-34 (a) (11) and that order was entered in a 'child custody' case, this Court has also looked to the issue raised on appeal in determining whether a party was entitled to a direct appeal"). Thus, the Court of Appeals in *Hartman* focused its analysis on whether the order at issue in that case was primarily a child custody determination, on the theory that if it were, no application would be required, per OCGA § 5-6-34 (a) (11). See *Hartman*, 371

19

Ga. App. at 579. The court ultimately concluded that the custody determination in the order at issue in that case was merely "ancillary to the grant of De Caro's equitable caregiver determination," such that a discretionary application was required. Id. But, as noted above, our case law says that whether an order is immediately appealable under OCGA § 5-6-34 (or whether an interlocutory application is required instead) is a separate question from whether a discretionary application is required by OCGA § 5-6-35. And regardless of the proper approach regarding a custody order issued in a divorce proceeding, that has no bearing in the context of orders issued under the Equitable Caregiver Statute outside of a divorce proceeding, which, as explained above, are not "orders in divorce, alimony, [or] other domestic relations cases" that require a discretionary application under OCGA § 5-6-35 (a) (2).[8] The Court of Appeals thus was wrong in *Hartman* to follow the

---

[8] To the extent that a petition under the Equitable Caregiver Statute might be brought *in* the context of a divorce proceeding, we express no opinion about whether appeals from orders or judgments entered in such a case must come by discretionary application.

20

divorce line of cases.

Citing *Numanovic v. Jones*, 321 Ga. App. 763 (743 SE2d 450) (2013), Boone suggests that an order granting equitable caregiver status also may be subject to discretionary appeal because a petition for equitable caregiver status is "analogous to an action for legitimation, the appeal of which is also discretionary." In *Numanovic*, the Court of Appeals held that a father was required to file a discretionary application to seek an appeal from an order denying his petition for legitimation (which he filed in the context of an adoption action), citing both OCGA § 5-6-35 (a) (2) and OCGA § 5-6-35 (a) (12), the latter of which requires a discretionary application for "[a]ppeals from orders terminating parental rights[.]" See *Numanovic*, 321 Ga. App. at 764. But even if a discretionary application generally is required for an appeal from an order denying a legitimation petition (a point not before us and that we do not decide),[9] an order ruling on a petition for equitable caregiver status is not such an order; petitions for legitimation are governed

---

[9] Some of us are doubtful that *Numanovic* was rightly decided.

21

by a completely different Code section. And an order *granting* equitable caregiver status, the sort of order at issue here, certainly does not itself amount to an order "terminating parental rights."

Because the order at issue does not fall within OCGA § 5-6-35 (a) (2), Dias was not required to file a discretionary application. We therefore turn to her arguments on the merits.

3. *We do not reach a definitive conclusion on the constitutionality of the Equitable Caregiver Statute, because it does not apply to Dias's conduct that forms the basis for Boone's petition.*

Dias argues that the Equitable Caregiver Statute is unconstitutional because it violates the due process right of parents under both the federal and Georgia constitutions and because it violates equal protection principles found in both constitutions. Dias's arguments raise serious questions about the constitutionality of the Equitable Caregiver Statute, but we need not resolve those questions here, because we conclude as a matter of statutory construction that the statute does not apply to this case.

(a) *Dias raises serious questions about whether the Equitable*

*Caregiver Statute violates the fundamental constitutional right of parents to the care, custody, and control of their children.*

At their core, Dias's challenges to the Equitable Caregiver Statute are based on the premise that the right of fit parents to the care, custody, and control of their children is secured by both the United States Constitution and the Georgia Constitution. See *Troxel v. Granville*, 530 U.S. 57, 65 (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion); *Patten v. Ardis*, 304 Ga. 140, 143-144 (2) (816 SE2d 633) (2018). The United States Supreme Court has recognized this right as embedded in the Due Process Clause of the Fourteenth Amendment. See *Troxel*, 530 U.S. at 66.

This right, which found recognition in the common law of England long before Georgia adopted the common law as our own, was recognized by this Court as early as 1858. See *Patten*, 304 Ga. at 141 (2) (citing *Rives v. Sneed*, 25 Ga. 612, 622 (1858)). Early Georgia cases "acknowledged the 'paramount right' of parents to the care, custody, and control of their children, but recognized that the right could be overcome by a showing of harm or threat of harm to

23

the child." *Patten*, 304 Ga. at 142 (2) (citing *Sloan v. Jones*, 130 Ga. 836, 851 (62 SE 21) (1908); *Moore v. Dozier*, 128 Ga. 90, 93 (57 SE 110) (1907)); see also *Hill v. Rivers*, 200 Ga. 354, 358-365 (37 SE2d 386) (1946) (surveying early cases).

Although these early decisions did not clearly construe or even apply any particular provision of the Georgia (or federal) constitution, we have since recognized that these principles are of constitutional dimension under the Georgia Constitution and may be embodied in Article I, Section I, Paragraph I, which guarantees due process, or Article I, Section I, Paragraph XXIX, which recognizes unenumerated, "inherent rights" retained by the people. See *Patten*, 304 Ga. at 143 (2) n.9. ("In past cases, we have been less than precise about the particular provisions of our state Constitution that guarantee the right of parents to the care, custody, and control of their children."). The due process provision has been in our state constitution in materially the same form since 1861, while the inherent rights provision has been in the Georgia Constitution in materially the same form since 1877. See Ga. Const.

24

of 1861, Art. I, Sec. IV ("No citizen shall be deprived of life, liberty or property, except by due process of law, and of life or liberty, only by the judgment of his peers."); Ga. Const. of 1877, Art. I, Sec. V, Par. II ("The enumeration of rights herein contained as a part of this Constitution, shall not be construed to deny to the people any inherent rights which they may have hitherto enjoyed.").[10] Thus, they have remained the same throughout most of the development of this body of law. Therefore, although our case law prior to the ratification of the current Georgia constitution may fall short of the sort of consistent and definitive construction that presumptively was carried forward into that current constitution, see *Elliott v. State*, 305 Ga. 179, 184 (II) (B) (824 SE2d 265) (2019), this case law still is relevant to our understanding of those constitutional

---

[10] There was a sort of inherent rights provision in the 1861 and 1865 constitutions, as well as 1795 amendments to the 1789 constitution. See Ga. Const. of 1865, Art. I, Sec. XXI; Ga. Const. of 1861, Art I, Sec. XXVII; Ga. Const. of 1789, Art. VIII. But there was no provision of this sort in the 1798 or 1868 constitutions. See also generally Brennan Mancil, "Reviving Elusive Rights: State Constitutional Unenumerated Rights Clauses as Bounded Guarantors of Fundamental Liberties," 19 Georgetown J. of L. & Pub. Pol'y 281, 309-316 (Winter 2021) (discussing Georgia's inherent rights provision generally and as a guarantor of parental rights specifically).

provisions as they were carried forward into later constitutions.

Based on recognition of this fundamental right held by parents, we have said that custody may not be awarded to a third party "in the absence of a voluntary relinquishment of [] parental rights, parental abandonment or unfitness, or other exceptional cause, established by clear and strong evidence." *Patten*, 304 Ga. at 142 (2) (citing *Miller v. Wallace*, 76 Ga. 479, 486-487 (2) (1886)); see also *Harris v. Snelgrove*, 290 Ga. 181, 182 (2) (718 SE2d 300) (2011) ("[A] parent has a right of custody to her child in preference to a third party unless there is clear and convincing evidence that the parent is unfit."); *In re Suggs*, 249 Ga. 365, 367 (2) (291 SE2d 233) (1982) (the right to custody and control of one's child "is a right that should be infringed upon only under the most compelling circumstances"). A plurality of this Court upheld the state's third-party custody statute, OCGA § 19-7-1 (b.1), which explicitly contains a rebuttable presumption that it is in a child's best interest for custody to be awarded to the child's parent or parents, only after construing the statute as requiring a non-parent relative seeking custody to show

by clear and convincing evidence that parental custody would harm the child. See *Clark v. Wade*, 273 Ga. 587, 598 (IV) (544 SE2d 99) (2001). The full Court later stated that "a parent has a right of custody to her child in preference to a third party *unless there is clear and convincing evidence that the parent is unfit.*" *Harris*, 290 Ga. at 182-183 (2) (emphasis supplied).

And we have said that even an order of visitation with a non-parent may not be imposed "over the objection of fit parents simply on the best interests of the child, without a clear and convincing showing of actual or imminent harm to the child[.]" *Patten*, 304 Ga. at 144-145 (3) (citing *Brooks v. Parkerson*, 265 Ga. 189, 194 (2) (c) (454 SE2d 769) (1995)). We have applied these constitutional principles to hold unconstitutional provisions in prior versions of the state's relative-visitation statute, OCGA § 19-7-3, because those provisions permitted a court to set aside the decisions of a fit parent about what is best for his or her child, without requiring clear and convincing proof that particular decisions not to permit grandparent visitation harmed or threatened to harm the child. See *Patten*, 304

27

Ga. at 144-145 (3); *Brooks*, 265 Ga. at 194 (2) (c); accord *Troxel*, 530 U.S. at 67-73 (state visitation statute unconstitutional as applied in grandparent visitation order over objections of undisputedly fit parent where parent did not oppose all visitation and court gave no weight to parent's decisions). We later upheld a provision in the current version of the relative-visitation statute, which now includes visitation by siblings and great-grandparents, only after the statute was amended to require a showing of "clear and convincing evidence" that the health and welfare of the child would be harmed without visitation. See *Barnhill v. Alford*, 315 Ga. 304, 313 (2) (b) (882 SE2d 245) (2022); Ga. L. 2016, p. 87-88, § 1.

The Equitable Caregiver Statute contains statements of respect for a parent's fundamental right to the care, custody, and control of her child. The statute requires a putative equitable caregiver to show by clear and convincing evidence "that the child will suffer physical harm or long-term emotional harm[.]" OCGA § 19-7-3.1 (d) (5). The statute also states that "[t]he adjudication of a person under this Code section as an equitable caregiver does not

28

disestablish the parentage of any other parent." OCGA § 19-7-3.1 (j).[11]

But Dias raises serious constitutional questions about the statute. In order to give effect to parents' fundamental constitutional right, courts traditionally presume "that a fit parent will act in the best interest of his or her child." *Troxel*, 530 U.S. at 69. But unlike Georgia's relative-visitation statute, the Equitable Caregiver Statute does not explicitly require trial courts to give deference to a parent's judgment as to the best interests of the child regarding visitation with a third party. Compare OCGA § 19-7-3 (c) (3), (d) (1) with OCGA § 19-7-3.1. And unlike the third-party custody statute, the Equitable Caregiver Statute contains no presumption that it is in the best interests of a child to be in the custody of her legal parent. Compare OCGA § 19-7-1 (b.1) with OCGA § 19-7-3.1.

---

[11] It is unclear what meaning — if any — this language actually has in the light of the rest of the statute. It is plainly true that adjudicating someone as an equitable caregiver does not terminate any parental rights. But it is also plainly true that affording a third party new rights to custody, visitation, or other matters that fit parents otherwise control effectively diminishes the fit parent's rights.

Even more troubling, the Equitable Caregiver Statute on its face does not require that relief awarded to an equitable caregiver be narrowly tailored to the harm or threatened harm that has been shown. Again, one of the prerequisites for establishing "standing" as an equitable caregiver under the statute is demonstrating "that the child will suffer physical harm or long-term emotional harm and that continuing the relationship between such individual and the child is in the best interest of the child." OCGA § 19-7-3.1 (d) (5). But as noted above, that language does not specify what circumstances must be the source of that harm — under what scenario the child "will suffer . . . harm" — for that criterion to be satisfied. Perhaps a reasonable construction of that provision is that to be afforded equitable caregiver "standing," a petitioner must show that the absence of "continuing the relationship between such individual and the child" would cause the child physical or long-term emotional harm. But once the putative equitable caregiver satisfies the criteria for establishing "standing," it is not clear from the language of the statute what more, if anything, must be shown before the trial court

"enter[s] an order as appropriate to establish parental rights and responsibilities for such individual, including, but not limited to, custody or visitation." OCGA § 19-7-3.1 (g).

At the very least, our case law requires a showing by clear and convincing evidence that the child will suffer harm from a fit parent's *particular decision* regarding the child's contact with a third party, and that the trial court's remedy be tailored to the harm caused by that decision. See *Patten*, 304 Ga. at 140 (holding that prior version of relative-visitation statute violated the Georgia constitutional right of parents to the care, custody, and control of their children because "it permit[ted] a court to set aside the decisions of a fit parent about what is best for his or her child, without clear or convincing proof that *those decisions* have harmed or threaten to harm the child" (emphasis supplied)). Moreover, it is difficult to conceive of a scenario in which a child will suffer harm due to a fit parent's decision to decline to share *legal custody* (as opposed to merely allowing some visitation or other contact) with a third party. And yet the Equitable Caregiver Statute purports to

31

allow a grant of "custody" to someone other than the child's legal parent, OCGA § 19-7-3.1 (g), without explicitly requiring a finding that the legal parent is unfit to exercise custodial rights. Absent a requirement that the relief awarded be tailored to the specific harm demonstrated by clear and convincing evidence, serious questions about the statute's constitutionality exist.

(b) *Boone makes a strong argument that parents may waive their constitutional right at least in some limited fashion through the sort of behavior contemplated by the Equitable Caregiver Statute.*

Boone's defense of the constitutionality of the Equitable Caregiver Statute has emphasized the statute's requirement that the legal parent have "fostered or supported" the relationship between the child and the putative equitable caregiver. OCGA § 19-7-3.1 (d) (3). To the extent that Boone argues that a parent who fosters or supports a parent-like relationship between her child and another may in some circumstances give up her constitutional right as a parent at least in some limited respect, that argument has some force, as even fundamental constitutional rights can be waived. See,

32

e.g., *Daniel v. Daniel*, 250 Ga. 849, 851 (2) (301 SE2d 643) (1983) ("Constitutional rights may be waived, as may rights created by statute."); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (99 SCt 1755, 60 LE2d 286) (1979) ("Even when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (citation and punctuation omitted)); *Pierce v. Somerset Ry.*, 171 U.S. 641, 648 (19 SCt 64, 43 LE 316) (1898) ("A person may, by his acts or omission to act, waive a right which he might otherwise have under the constitution of the United States as well as under a statute[.]"). Indeed, we have a long tradition of recognizing voluntary relinquishment of parental rights by contract under the statutory provision currently found at OCGA § 19-7-1 (b) (1) ("Parental power shall be lost by: [v]oluntary contract releasing the right to a third person[.]"). See *In re M.A.F.*, 254 Ga. 748, 751 (1) (334 SE2d 668) (1985); *Durden v. Johnson*, 194 Ga. 689, 689 (2) (22 SE2d 514) (1942); *Wilkinson v. Lee*, 138 Ga. 360, 362 (1) (75 SE 477)

33

(1912); *Janes v. Cleghorn*, 54 Ga. 9, 14 (2) (1875).

Here, Dias has stipulated that she "fostered and supported" Boone's "bonded and dependent relationship with" M.D. and "held [Boone] out as a parent of" M.D. on various school and medical records. But even if that sort of conduct could amount to a waiver of a parent's fundamental constitutional right, we have serious concerns with concluding that Dias has waived that right here. In most contexts, a waiver of constitutional rights must be knowing, voluntary, and intelligent in order to be effective. See, e.g., *Rosenbaum v. State*, 320 Ga. 5, 16 (2) (b) (907 SE2d 593) (2024) (waiver of right to conflict-free counsel valid under the Sixth Amendment if the waiver is knowing, voluntary, and intelligent); *Green v. State*, 318 Ga. 610, 615-616 (II) (A) (1) & n.3 (898 SE2d 500) (2024) (guilty pleas satisfy constitutional due process if they are both voluntary and intelligent, the latter being synonymous with "knowing"); see also *Matter of Adoption of T.M.M.H.*, 416 P3d 999, 1009 (Kan. 2018) ("[T]o give effect to a natural mother's waiver of parental preference in favor of a third party, the waiver must be

34

made knowingly, intelligently and voluntarily[.]" (citation omitted)). And in order to be knowing and intelligent, a waiver must be done with sufficient awareness of the likely consequences. See *Green*, 318 Ga. at 614 (II) ("In light of the guilty plea's nature and its consequences, as a matter of federal constitutional law the plea must be both voluntary (made of the defendant's own free choice) and intelligent (made with awareness of the relevant circumstances and likely consequences)."); *Smith v. State*, 287 Ga. 391, 394 (2) (a) (697 SE2d 177) (2010) ("As a matter of constitutional due process, before a defendant pleads guilty, the trial court must advise him of the 'direct' consequences of entering the plea, but not of all the potential 'collateral' consequences, in order for the guilty plea to be considered knowing and voluntary." (citations omitted)), overruled on other grounds by *Collier v. State*, 307 Ga. 363, 368-369 (1), 376-377 (834 SE2d 769) (2019).

Here, at the time that Dias engaged in the conduct at issue, she could not have known that the possible consequences of that conduct included any effect on her parental rights. Dias stipulated that she

35

"fostered and supported" the relationship between Boone and M.D. only "until January 2018." Boone testified about Dias withholding M.D. from her beginning in January 2018. And the trial court found that Dias "severed" the relationship between Boone and M.D. around February 2018. But the Equitable Caregiver Statute was not enacted until the 2019 Session of the General Assembly and did not become effective until July 1, 2019. See Ga. L. 2019, pp. 632-636 (containing no provision for effective date); OCGA § 1-3-4 (a) (1) (unless otherwise specified in the act, any act approved by the governor on or after first day of January and prior to first day of July of a calendar year shall become effective on the first day of July).

Prior to the act's effective date, Georgia law did not provide that merely "fostering or supporting" a particular relationship with another could result in yielding any portion of parental rights to that person. Thus, a Georgia parent who consulted counsel or Georgia statutory or case law in the years that Dias was admittedly "fostering or supporting" a relationship between Boone and M.D. would have concluded that no such result would occur. She would

36

have discovered instead that Georgia law at the time provided for a number of means by which a parent could lose her power — such as by consent to adoption, abandonment, or "[v]oluntary contract releasing the right to a third person" — but did not recognize a concept of equitable caregiver by which a parent could yield at least some parental power by "fostering or supporting" a particular relationship. See OCGA § 19-7-1 (b) (2014). For that matter, at that time a parent would have discovered longstanding case law to the effect that in order for such a "voluntary contract" to effectuate a loss of parental power, the contract must be "clear, definite, and certain." See *Durden*, 194 Ga. at 689 (2); *Wilkinson*, 138 Ga. at 363 (1); *Miller v. Wallace*, 76 Ga. 479, 487 (2) (1886); see also *Looney v. Martin*, 123 Ga. 209, 213 (51 SE 304) (1905) (noting that "more than the usual proof" is required to support a contention that a fit and able father has voluntarily relinquished his right to custody and control of his children).[12]

---

[12] Indeed, Boone testified at trial that although Dias "would always tell me I promise I'll never keep her from you," "[t]he threat was always just

(c) *We need not decide the difficult constitutional questions posed by this case, because the Equitable Caregiver Statute is reasonably susceptible to a construction that it does not apply to conduct by parents prior to the statute's effective date.*

The constitutional issues posed by this case thus raise important, novel, and difficult questions. We need not decide these difficult constitutional questions here, however. As noted above, the trial court found that Boone's contact with M.D. was severed by Dias in early 2018 — meaning that the conduct by Dias that is the basis for Boone's petition took place prior to that date — while the statute became effective July 1, 2019. And the statute is reasonably susceptible to a construction that it does not apply at all to conduct by a parent that took place prior to the effective date.

"Generally speaking, this Court will not reach novel constitutional questions when a case can be resolved without passing on such issues." *State v. Randall*, 318 Ga. 79, 81 (2) (897

---

remember I'm the legal parent and you're not if she got mad. Of course it would upset me."

SE2d 444) (2024). Principles underlying the separation of powers counsel us not to decide unnecessarily the constitutionality of statutes. See id. This is "especially so in cases where the constitutional merits are important, novel, and difficult." See id. at 82 (2) (citation and punctuation omitted). Here, an issue of statutory construction "presents a threshold issue of constitutional avoidance," because if the Equitable Caregiver Statute does not apply to a parent's conduct prior to its effective date, "this Court will have no occasion to reach the merits of" Dias's constitutional claim. *State v. Mondor*, 306 Ga. 338, 344-345 (2) (830 SE2d 206) (2019). Although Dias did not enumerate as error that the trial court erred by applying a statute that does not apply to conduct taking place prior to its effective date, a party cannot force us to reach a constitutional issue simply by assuming a statute means something it does not.[13]

---

[13] And we cannot completely avoid the constitutional issues implicated here by addressing the (at least superficially) non-constitutional sufficiency-of-the-evidence argument that Dias does raise. Fully addressing Dias's argument that the evidence of harm presented by Boone was insufficient would require

"The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, which has language similar to the Due Process Clause in Georgia's Constitution, protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Southern States Chemical, Inc. v. Tampa Tank & Welding, Inc.*, 316 Ga. 701, 707 (1) (888 SE2d 553) (2023) (footnotes, citation, and punctuation omitted). Additionally, the Georgia Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed." See id. at 707 (1) n.8 (citing Ga. Const. of 1983, Art. I, Sec. I, Par. X). "In determining whether legislation can be applied retroactively, we engage in a two-part analysis." Id. at 708 (1). "Because of the presumption against retroactive legislation, this Court will initially insist upon some clear indication in the statutory

us to determine what sort of evidence of harm is required to satisfy the statute, which, as discussed above, necessarily implicates the difficult issues of parents' constitutional right to the care, custody, and control of their children identified herein.

40

text that a statute is to be applied retroactively before so applying it." Id. (citation and punctuation omitted). Often any such clear indication is found in an uncodified portion of the enacting legislation. See, e.g., *Deal v. Coleman*, 294 Ga. 170, 175 (1) (b) (751 SE2d 337) (2013). "It is only when such a clear indication is present that we then consider whether retroactive application is unconstitutional," which often amounts to an inquiry into whether retroactive application would "injuriously affect the vested rights of citizens." *Southern States Chemical*, 316 Ga. at 708 (1) (citations and punctuation omitted).

Here, there is absolutely no indication in the text of OCGA § 19-7-3.1 or its enacting legislation that the statute is to be applied retroactively. Compare OCGA § 19-7-3.1 and Ga. L. 2019, pp. 632-636, with Ga. L. 2005, pp. 1, 18, § 15 (distinguishing between provisions of Tort Reform Act, such as provisions on apportionment, damages caps, and emergency medical care standard of liability, that "shall apply only with respect to causes of actions *arising on or after* the effective date of this Act" and those provisions, such as offer

41

of settlement and expert qualification provisions, that "shall apply to causes of action *pending on* its effective date" (emphasis supplied)). Boone does not argue otherwise.

Instead, Boone suggests that applying the statute to this case does not amount to a retroactive application of the statute at all. Boone correctly points out that a "statute does not operate retrospectively because it relates to antecedent facts[.]" *Adams v. Adams*, 219 Ga. 633, 634 (135 SE2d 428) (1964) (citation and punctuation omitted). Rather, a statute applies retroactively if it "creates a new obligation on transactions or considerations already past, or destroys or impairs vested rights" and "if it is intended to affect transactions which occurred or rights which accrued before it became operative as such, and which ascribe to them essentially different effects, in view of the law at the time of their occurrence[.]" Id. (citations and punctuation omitted). But here, applying the Equitable Caregiver Statute to effectively deprive a parent of some or all of her rights to the care, custody, and control of her child, on the theory that conduct by a parent prior to the statute's effective

42

date amounted to a waiver of those rights, would appear to do just that. As explained above, during the time that Dias admittedly "fostered and supported" M.D.'s relationship with Boone, such conduct by a parent by itself would not have resulted in a loss of parental rights under existing Georgia law.

Boone suggests that applying the Equitable Caregiver Statute to this case does not amount to an impermissible retroactive application of the statute because "no one may acquire a vested interest in the custody of a minor child." *Smith v. Finstad*, 247 Ga. 603, 604 (277 SE2d 736) (1981); see also *George v. Sizemore*, 238 Ga. 525, 527 (233 SE2d 779) (1977); *Adams*, 219 Ga. at 634. To the extent this is an argument that applying OCGA § 19-7-3.1 to the conduct of a parent undertaken prior to the statute's effective date is not really a retroactive application at all because no vested right is implicated, we cannot agree.[14] We have said in allowing

---

[14] To the extent Boone is arguing based on this line of cases that the retroactive application of OCGA § 19-7-3.1 is constitutionally *permissible*, we are not faced with that question here, given that the statute does not contain a clear indication that it is to be applied retroactively.

application of a new statute to a change-of-custody petition as between legal parents that "[w]here an award of custody is made to a parent in a divorce action and subsequently there is a change of circumstances and conditions substantially affecting the welfare of the child, the parent to whom custody was awarded does not have a *vested* right of custody that will defeat further action by the courts." *Adams*, 219 Ga. at 634 (emphasis in original)).

We later applied that principle to permit application of new or amended statutes to grandparent-visitation petitions. See *Smith*, 247 Ga. at 604 (permitting application of 1980 statutory amendment expanding scenarios under which grandparents may seek visitation, to include scenarios when their own child has died or lost parental rights through termination, notwithstanding prior decree of adoption by stepparent); *George*, 238 Ga. at 528 (permitting application of new 1976 law permitting grandparent visitation rights to modify 1975 decision changing custody from grandparents to father). On their face, these cases could be understood to stand for the proposition that a new statute may be applied to upset a prior

44

child custody determination. But the possible retroactivity problem with applying OCGA § 19-7-3.1 to this case that we have identified is not that it would upset a prior court decree about custody of a child. Instead, the reason that applying OCGA § 19-7-3.1 arguably constitutes a retroactive application of the statute is that this would "ascribe to" Dias's conduct "essentially different effects" than it would have had "in view of the law at the time of their occurrence[.]" *Adams*, 219 Ga. at 634. In none of the cases cited did this Court permit the application of a new statute to affect a child custody determination while acknowledging that doing so would ascribe different legal effects to a legal parent's conduct.[15] Thus, these cases do not stand for the proposition that it is never a retroactive application of a statute to ascribe to the conduct of a parent

---

[15] In *Smith*, we noted that an amendment to the state's relative-visitation statute allowed a grandparent-visitation petition to be filed where the parental rights of the grandparents' child had been terminated. See 247 Ga. at 604. But to the extent that the mother in *Smith* may have consented to a stepparent adoption resulting in termination of the biological father's rights in reliance on prior law that would not make such a decision a basis for a grandparent-visitation petition — the facts of the case being somewhat unclear from our opinion — the opinion contains no discussion of that issue and thus is not a holding on it.

undertaken prior to the statute's effective date different effects on the question of custody. See *State v. Stanford*, 312 Ga. 707, 710 (864 SE2d 448) (2021) ("[O]ur precedent makes it clear that questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citation and punctuation omitted)).[16]

---

[16] In *Bryan v. Bryan*, 242 Ga. 826 (251 SE2d 566) (1979), superseded on other grounds by statute as noted in *Reno v. Reno*, 249 Ga. 855, 856 (295 SE2d 94) (1982), cited by Boone to the trial court, we did reject a retroactivity argument that was based on the notion that the new statute in question would ascribe different effects to a particular action by one of the parties. In that case, the issue was whether a new statute requiring a husband's conduct toward his wife to be considered in alimony determinations could apply to allow admission of the husband's pre-statute adulterous conduct. But that case is distinguishable because we rested our decision in part on the basis that the husband could have no vested right engaging in adultery without consequence to an alimony determination because "in Georgia adultery is now, and at all times relevant hereto has been, a crime[.]" *Bryan*, 242 Ga. at 828 (2).

We also note that this Court previously permitted an amended termination-of-parental rights statute to apply to a case on remand, saying "[t]here are no vested rights that will be impaired" by application of the amended statute. See *In re L.L.B.*, 256 Ga. 768, 768 (353 SE2d 507) (1987). A review of statutory amendments there indicates that they were significant, including a revision of the statutory grounds permitting termination. See Ga. L. 1986, pp. 1017, 1018-1023, §§ 3-4. But our failure to discuss these substantive changes, including whether they would provide a basis for termination in the particular case before the Court that did not exist previously, and our statement in the opinion indicating that our decision was based at least in part on our view that retrial under the new law "may have a

Moreover, putting aside what they say about retroactive application of statutes, these cases do not contain any discussion of whether application of new statutes to child custody decisions implicates the fundamental right of a parent to the care, custody, and control of their children.[17] Thus, they are not holdings about the extent to which applying statutes to ascribe different effects to conduct by parents undertaken prior the effective date of the statute violates that particular right. See *Stanford*, 312 Ga. at 710.[18] Here,

salutary effect" given the difficult facts presented there, *In re L.L.B.*, 256 Ga. at 768-769, make that decision of little help to our retroactivity analysis here. See *Stanford*, 312 Ga. at 710.

[17] In *Smith*, we noted that the parents had attacked the grandparent visitation statute "as against public policy, as unconstitutionally retrospective as applied to them, and as unconstitutional on a number of grounds wholly without substance." 247 Ga. at 604. But our opinion in *Smith* did not further elucidate the nature of those arguments besides the retroactivity argument. *George* does not discuss the constitutional rights of parents specifically. Nor did *Adams*, which involved a dispute between two legal parents.

[18] Citing *Clark v. Wade*, Boone also argues that "statutory and case law in effect for generations has upheld that a court may intercede where a parent takes an action that causes significant, ongoing harm to her child." But that argument goes to the question of whether a statute can be applied retroactively under the constitution. We do not reach that question given that we conclude that the statute contains no clear indication that it is to be applied retroactively. Moreover, *Clark* contains no holding about retroactivity; indeed, the Court ultimately did not apply the statute at issue to the particular facts of the cases before it at all but remanded for the trial court to do that. See 273 Ga. at 600 (V).

as explained above, the Equitable Caregiver Statute may well infringe on a parent's constitutional right to the care, custody, and control of her child, absent a finding that a parent has waived that right by her conduct. And applying the statute to give such legal effect to conduct undertaken by a parent prior to the statute's effective date — to include situations such as those presented here where such a putative waiver is premised on such conduct — would itself raise serious constitutional questions, given that such a waiver may not be knowing and intelligent given the status of Georgia law prior to the effective date of the statute. Given those constitutional questions, and that the statute does not contain a clear indication that it is to be applied retroactively, we conclude that the statute does not apply to parental conduct occurring before its effective date.

In sum, Dias's challenge to OCGA § 19-7-3.1 raises novel, difficult, and important questions. We have serious concerns about the constitutionality of the statute, which might be remedied only by a conclusion that Dias has waived her constitutional right as a parent to the care, custody, and control of her child. These

constitutional questions may largely be obviated by concluding that any sort of waiver of a constitutional right contemplated by the statute cannot be premised on conduct by the parent prior to the statute's effective date. OCGA § 19-7-3.1 contains no clear indication that it is to apply to actions by a parent fostering or supporting a relationship between the petitioner and the child prior to the effective date of the statute, and we hold that it does not do so. Because there is no dispute here that Boone's petition for adjudication as an equitable caregiver was based on Dias's actions undertaken solely prior to the effective date of the statute, the trial court's January 2024 order granting Boone equitable caregiver status and associated custody and visitation is reversed.

*Judgment reversed. All the Justices concur.*