Miller vs. Wallace et ux.

MILLER vs. WALLACE et ux.

[This case was argued at the last term, and the decision reserved.]

1. The father, under the law, has the control of his minor child, and this can be relinquished or forfeited only in one of the modes recognized by law.

2. In all writs of *habeas corpus* sued out on account of the detention of a child, the court, on hearing all the facts, may exercise its discretion in awarding the custody of the child, and shall have authority to award such custody to a third person. Such discretion, however, is not arbitrary or unlimited, but is a discretion guided and governed by the rules of law.

(a.) Under the discretion vested in him, no judge has authority to disregard or even to impair any acknowledged or established right of a party by its exercise, and if he does so, he abuses that discretion. The power ought to be exercised in favor of the party having the legal right, unless the circumstances of the case and the precedents established would justify the court, acting for the welfare of the child, in refusing it.

(b.) *Prima facie* the right of custody of an infant is in the father, and where this is resisted upon the ground of his unfitness for the trust, or other cause, a proper regard for the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs; and a clear and strong case must be made to sustain an objection to the father's right.

(c.) Where it is insisted that the father has relinquished his right to the custody of his child to a third person by contract, the terms of the contract, to have the effect of depriving him of his control, should be clear, definite and certain.

(d.) Tested by these rules, the facts of this case do not authorize a decision depriving the father of the custody and control of his minor child and awarding it to the maternal grandparents of the child, its mother being dead.

(e.) This case differs from those in 54 *Ga.*, 9–14; 68 *Id.*, 87, 650; 59 *Id.*, 555; 14 *Id.*, 657.

3. That the father resorted to a stratagem to get the child from the possession of its maternal grandmother, in order to avoid an altercation, did not affect his rights injuriously; especially in view of his explanation thereof in a letter to the grandmother, it does not appear as an acknowledgment that he was conscious that he did not have the right to such custody.

4. The father's means of providing for the child are more certain and ample than those of the grand-parents; the legal duty of supporting it rests upon him, not them; and it appears that the home provided by him for the child is a proper one.

5. The child, with him, is in a position where the father's intercourse with it can be more frequent and unrestrained than it has been; and where he can support it with less inconvenience and expense, and can more constantly overlook and direct it; and it is for the child's welfare so to remain.

March 23, 1886.

Parent and Child. Contracts. Minors. Before Judge CLARKE. City Court of Atlanta. At Chambers, May 26, 1885.

William and Caroline Miller petitioned for the writ of *habeas corpus* to obtain the custody of Etta Wallace Miller, a child four years of age, from the possession of her father, James T. Miller. They alleged that the child had been entrusted to them to raise to mature years; that her father had relinquished his control over her, and that they had temporarily entrusted her to his keeping, but he refused to return her to them.

In answer to the writ, the defendant traversed the substantial allegations of the petition, and asserted his parental right to the custody of his child.

On the hearing, the evidence for the plaintiffs was, in brief, as follows: The defendant married the daughter of the plaintiffs, who were then living in Texas. In 1880, Wallace became interested in a political contest and left a position to fill several appointments. On returning, he found his wife excited over a letter from their daughter, who had removed to Georgia with Miller. Mrs. Wallace came to Georgia, and Wallace followed her in 1883. The child then was under the protection of his son, brother and

wife.   Shortly before she died, Miller's wife stated to her
mother that she wanted the latter to take, care for and
raise the child.   Just after the death of Mrs. Miller, Mrs.
Wallace asked Miller about the child, and he responded
that as his wife wanted Mrs. Wallace to have the baby, she
should do so.   She took charge of it, treated it kindly and
cared for it tenderly.   Miller furnished certain money,
milk, etc., for its support, but not what Mrs. Wallace
considered sufficient, and she taxed him therewith..  She
borrowed money for the child's support.   Miller said
nothing about taking it.   He was living with his mother
and sister, but they had stated that they did not wish
to take care of the child, and knew nothing of taking
care of children.   The little girl is of nervous temperament,
and Mrs. Wallace can quiet her better than any one else.
She said she did not want to go with her father.   About
a month after his wife's death, Miller said he wanted
Mrs. Wallace to raise the child as she had raised her
daughter, and make such a woman of her.   Wallace had
started a school, but gave it up because the locality was
not healthy for the child.   His son has contributed to
the support of the family.   They pay $20 per month rent
for a house.   Wallace has no money in bank, but has about
$100 in good accounts.   A short time before the case arose,
Miller asked Mrs. Wallace to let him take the child to stay
all night with him.   She objected on the ground that the
little girl was nervous and had never been away from her at
night.   He became angry, and said he had a legal right to
take the baby away, and would do so; that he did not in-
tend to take her away so soon, only that Mrs. Wallace was
claiming her.   The latter replied that he could not get the
child and knew it.   Before that, he always asked Mrs. Wal-
lace's consent when he took the child to walk.   Finally,
he asked to take her to walk, did so and did not bring her
back, but wrote a letter to Mrs. Wallace, asserting his par-
ental control, and stating that, as she had claimed the

v 76-31

child, he thought it best to adopt that means of taking possession.   He is a railway mail-clerk.

The evidence for the defendant was, in brief, as follows: The child is his only one.   He never consented for the grandparents to take and raise her to maturity.   It was his wife's desire that her mother should take care of the child during its helpless infancy, and its grandmother asked that she be allowed to keep it for that purpose, to which he assented.   The grandmother said, "Let me take her now; when she is older, you can take her."   He never relinquished his control of the child, but provided for her and was very fond of her.   Up to the time Mr. Wallace moved to Atlanta, defendant furnished everything and boarded Mrs. Wallace.   About two years before the trial, Mrs. Wallace spoke of the child's being so much trouble. Defendant said he could relieve her of all the trouble and take the child to his home.   Mrs. Wallace said he could not do so, and as the child was very young, he let her remain.   He continued to furnish provisions and money; he is able to maintain and educate the child, and desires to do so.   He is a railway mail-clerk on a salary of $1,300 per annum.   He is subject to be removed to another locality, but this is not probable.   He and his mother and sister are people of good standing; his mother has had experience in raising children, and they all are fond of this child, and desire to take care of her.   His younger brother contributes somewhat to the maintenance of the family, but the burden is principally on him.   The child is fond of him and satisfied to remain, though she did say on one occasion, when crying, that she wanted to go to her grandpa's.

The presiding judge awarded the custody of the child to the grandparents, and the defendant excepted.

KING & SPALDING, for plaintiff in error.

HILLYER & BRO., for defendants.

HALL, Justice.

The question in this case is whether, under the facts in evidence, the judge abused his discretion in taking the minor child, Etta Wallace Miller, from the custody of her father, James T. Miller, who was the respondent in this *habeas corpus* proceeding, and ordering her to be remanded. and delivered, and to remain in custody of petitioners for the writ, William and Caroline Wallace, her maternal grandfather and grandmother. The solution of this question turns upon the point, whether the father, by a voluntary contract, released his legal and parental right to the control of his child to these petitioners, or either of them, or whether he consented to her adoption by them, or either of them, for it is not pretended that he forfeited his right to her custody and control, either by a failure or inability to provide necessaries for her, or by abandoning her, or by cruel treatment, or that, by reason of his bad character and immoral habits, he could not be trusted with her rearing and education without detriment to her well-being. The defendant and his wife (the father and mother of the infant) lived together in harmony until the death of the mother. There appears to have been no domestic infelicity or jars between them. There was nothing, in short, as long as they lived, that could by any possibility afford a ground of contest as to the control or custody of their infant child by either to the exclusion of the other; neither was there anything tending to show that the dead wife, in her lifetime, distrusted her husband's capacity or fitness to have control of the rearing and education of their child, or evincing a desire on her part to see him deprived of his power and authority in this respect.

1. It is indisputable that the father, under the law, has the control of his minor child, and that this can be relinquished or forfeited only in one of the modes recognized by law, including those above specified, with some others

not applicable to the present status of this case.    Code, §§1733, 1793, 1794, 1795.

2. It is equally clear that in all writs of *habeas corpus* sued out on account of the detention of a child, the court, on hearing all the facts, may exercise its discretion as to whom the custody of such child shall be given, and shall have power to give such custody of a child to a third person.    Code, §4024.

The discretion to be exercised in such case is not an arbitrary and unlimited discretion like that confided to the Roman prætors, but, as remarked by Lord Mansfield in R. *vs.* Wilkes, 2 Burr., 25, 39, is such a " discretion as, when applied to a court of justice, means sound discretion guided by law.    It must be governed by rule, not by humor; it must not be arbitrary, vague and fanciful, but legal and regular."    In Rooke's case, 5 R., 99(b), it is said : " And notwithstanding the words of the commission give authority to the commissioners to do according to their discretions, yet their proceeding ought to be limited, and bound with the rule of reason and law.    For discretion is a science or understanding to discern between falsity and truth, between wrong and right, between shadow and substance, between equity and colorable glosses and pretences, and not to do according to their wills and private affections; for as one saith, *talis discretio discretionem confundit.*" As is stated by Lord Coke, 4 Inst., 41, "*Discretio est discerenere per legem quid sit justum,*" and by Sir Joseph Jekyll, M. R., in Cowper *vs.* Earl Cowper, 2 P. Wms., 753 : " Though proceedings in equity are said to be *secundum discretionem boni viri*, yet when it is asked *vir bonus est quis ?* the answer is *qui consulta patrum qui leges juraque servat;* and as it is said in Rooke's case, 5 Rep., 99(b), that discretion is a science not to act arbitrarily according to men's wills and private affections, so the discretion here is to be governed by rules of law and equity, which are not to oppose, but each in its turn to be subservient to the other.    This discretion in some cases follows the law im-

·plicitly, in others assists it, and advances the remedy; in others again it relieves against the abuse, or allays the vigor of it; but in no case does it contradict or overturn the grounds or principles thereof, as has been sometimes ignorantly imputed to this court. That is a discretionary power which neither this nor any other court, not even the highest, acting in a judicial capacity, is by the consti-·tution entrusted with." Dr. Broom in his Legal Maxims, 84 *et seq.*, in treating of the kind of discretion entrusted to courts and judges, pointedly and aptly remarks, " It is held the duty of the judge, in a land jealous of its liberties, ·to give effect to the expressed sense or words of the law, ·in the order in which they are found in the act, and accord-ing to their fair and ordinary import and understanding; for it must be remembered that the judges are appointed to administer, not to make the law; and that the jurisdic-·tion with which they are entrusted has been defined and marked out by the common law or acts of parliament.

" It is, moreover, a principle consonant to the spirit of our constitution, and which may be traced as pervading the ·whole body of our jurisprudence, that *optima est lex quæ minimum relinquit arbitrio judicis, optimus judex qui minimum sibi:* that system of law is best which confides as ·little as possible to the discretion of the judge; that judge the best who relies as little as possible on his own opinion." And he emphasizes and enforces this view, by adopting and ·declaring, in the language of Maule, J., that " there is no court in England which is entrusted with the power of administering justice without restraint. That restraint has been imposed from the earliest times. And, although instances are constantly occurring where the court might profitably be employed in doing simple justice between the parties, unrestrained by precedent or any technical rule, the law has wisely considered it inconvenient to con-fer such power upon those whose duty it is to preside in courts of justice. The proceedings of all courts must take a defined course, and be administered according to a

certain uniform system of law, which, in the general re-
sult, is more satisfactory than if a more arbitrary juris-
diction was given to them. Such restrictions have pre-
vailed in all civilized countries, and it is probably more
advantageous that it should be so, though at the expense
of some occasional injustice." Freeman *vs.* Tranah, 12 C.
B., 413, 414 (74 E. C. L. R). The citations in the foot-
notes of Broom at the pages quoted furnish many other
instances of the practical and indispensable application of
these principles.

The rule of discretion, as applicable to *habeas corpus*
cases, did not originate with the compilers of our
Code ; they took it from the common law, and in adopt-
ing it, they adopted also the meaning and limitations
placed upon it by the venerable sages and authorized ex-
pounders of that noble system. Under the "discretion"
vested in him, no judge has authority to disregard or even
to impair any acknowledged or established right of a party
by its exercise, and if he does so, it would seem to follow,
as a necessary consequence, that he abuses that discretion.
As was well remarked by the court, in the matter of *Mitch-
ell*, R. M. Charlton's R., 493, " the power ought to be ex-
ercised in favor of the party having the legal right, unless
the circumstances of the case, and the precedents estab-
lished, would justify it, acting for the welfare of the child,
in refusing its aid." Again (*Id.*, 495) it is said that the
court will draw no inference to the disadvantage of the
father, but will act from positive proof." The authority
of this case has been expressly recognized by this court
in *Boyd vs. Glass*, 34 *Ga.*, 258. It is a well-considered
and ably-argued case, is in point with the present case, and
decides every question made by it, is sustained by copious
references to such authorities, both English and American,
as existed at the time it was made, 1836, and by subse-
quent text-writers and adjudicators.

*Prima facie*, the right of custody of an infant is in
the father, and when this right is resisted, upon the

ground of his unfitness for the trust or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. " A clear and strong case " must be made to sustain an objection to the father's right. Commonwealth *vs.* Briggs, 16 Pickering, 205. This was determined in a contest on *habeas corpus* between the mother and father who had separated. The discretion to be exercised by the courts in such contests is not arbitrary. The rights of the father, on the one hand, and the permanent interest and welfare of the infant, on the other, are both to be regarded, but the right of the father is paramount, and should not be disregarded, except for grave cause. The breaking of the tie that binds them to each other can never be justified without the most solid and substantial reasons, established by plain proof. In any form of proceeding, the sundering of such ties should always be approached by courts " with great caution and with a deep sense of responsibility." State *vs.* Richardson, 40 N. H., 274, 275. *Taylor vs. Jeter*, 33 *Ga.* R., 195, 203, is fully in point. Jenkins, J., speaking for the court, there declares that the ground of objection to the right of the father should have " been distinctly alleged," and that " there should have been direct satisfactory proof adduced to sustain it." Where it is insisted that the father has relinquished his right to the custody of his child to a third person, by contract, which he might undoubtedly have done, yet the terms of the contract, to have the effect of depriving him of its control, should have been " clear, definite and certain." Drumb *vs.* Keen and wife. 47 Iowa, 435, 437.

Tested by these rules, this case seems to fall far short of their requirements. The most favorable light to the petitioners in which these facts can be regarded leaves it more than doubtful whether the defendant ever consented to relinquish the control of his child, or whether he was only making an arrangement in the exigency in which his

wife's death placed him for its temporary care and nurture. In the alleged contract, no length of time is expressed during which he is to relinquish his right; nothing is said about abandoning his control; in these particulars, there are no express stipulations, and it would be improper to deduce them from conduct on his part, which at most could only be regarded as respectful and deferential to his mother-in-law. It is certain that he availed himself of the opportunities which his business afforded to be with his child and to caress and care for it; he supplied its wants, furnishing its food and raiment, procuring for it medical attendance and meeting and defraying the expenses incurred on that account, and for a considerable portion of the time he maintained and supported its maternal grandmother while her husband was off in a distant state pursuing ambitious plans, in looking after the political promotion of his friend, rather than giving his time and attention to his family. He never at any time assented to claims set up by its grandmother, by act or word, to its exclusive custody and control, but always, when such issues were raised, denied her authority by courteous and deferential conduct and language; indeed, he avoided, as far as he could, such disagreeable topics; but it is obvious that he never meant by his forbearance to surrender his rights and privileges as a parent. This is shown by the letter addressed to her after he had obtained the custody of the child. We take it that the device to which he resorted to carry it to his own home was suggested rather to avoid a painful scene and angry controversy than for any other purpose, and that it would be going quite too far to infer from what then occurred that he had recourse to this contrivance to escape even an implied acknowledgment of her authority over this child to the exclusion of his own. The case of Drumb *vs.* Keen, *ut supra*, is much like this in its circumstances. There the party, at the request of a dying mother, and with the consent of the father, took her infant to *raise*, and in commenting on this word, the Supreme Court of Iowa

say, that if the lower court intended by it, that it was the understanding of both parties that defendants were to have the custody of the child until it attained its majority, " then we think the finding is so clearly against the evidence that it must be set aside, because there was no evidence to support it." The husband, in view of the impending death of his wife, in accordance with her expressed wish, delivered the child to the respondents in the writ of *habeas corpus.* This offer was accepted, and the child was sent at their expense from Missouri to their residence in Iowa. On the effect of this arrangement, the court says, " Conceding this offer and acceptance to have the force and effect of a contract, we are clearly of the opinion that it does not import that the plaintiff thereby deprived himself of the right to the care and custody of the child for any length of time. It may be admitted such a contract may be made, but certainly it should be clear, definite and certain." To the same effect is the case of Wishard *vs.* Medaris, 34 Ind. R., 168. In neither of these cases did the parent bear any of the expense of the nurture of the child, or of the maintenance of the person having its care and custody; and for this reason this case is stronger in favor of the right of the father than was either of them.

It is insisted, however, by the able and learned counsel for the plaintiffs in *habeas corpus*, that this court has adopted a different rule, as appears from its later, if not its earlier decisions, and he cites and confidently relies on *Janes vs. Cleghorn*, 54 *Ga.*, 9, 14, (S. C. in a different form of proceeding, and with parties reversed, 68 *Id.*, 87), *Bently vs. T.rry*, 59 *Id.*, 555, and *Smith vs. Bragg*, 63 *Id* , 650, as sustaining this position. But the marked differences between those cases and this will not justify th e conclusion he seeks to draw from them. A careful co mparison will show that they are not in conflict either with the earlier decisions of this court, or those relied on by opposing counsel from other courts, or with the principles announcedby the text writers. The first of these cases was

a contest for the custody of an infant, between the next of kin of the father, who was then dead, and the next of kin of the mother, who had been placed in charge of it in accordance with her wishes expressed on her death-bed, and which had been carried out by the father who survived her. The superior court, upon proof that the father had changed his mind and expressed a wish that his sister, one of the contending parties, should have the care of his child, awarded it to her. There was no proof, however, that the father ever took steps to consummate and effectuate this change of purpose, and there was proof that the husband of the father's sister had obtained the custody of the child by carrying it to his home for a visit, with an express promise to return it at the end of a week, which promise he violated. This court reversed that decision and remanded the child to the custody in which it had been placed by its parents in their life-time, holding in reference to the particular facts in the case, where the parental authority over an infant child is released to another, such release is not revocable without some sufficient legal reason therefor, and that the evidence in the case did not disclose that the father ever did revoke his consent to the arrangement made for the custody of his infant. So that the discretion of the lower court seems to have been controlled by this court because it had disregarded the plain rights of these custodians. The case was again brought here upon a contest between these parties for the guardianship of this child, which was instituted in the court of ordinary. When it was held that the parties in whose custody the child was left by its parents were entitled to the guardianship in preference to the father's next of kin, thereby re-affirming what was decided when the case was first here.

In *Bently vs. Terry*, the contention was between the father and mother of the child and an aunt and her husband, to whom its custody was committed, as they and their witnesses testified, by a contract, but as was denied by the father and mother. According to one set of witnesses, the

contract was definite, complete and certain, and the contrary was shown by the ·opposite parties.   On this vital point there was a direct conflict of evidence.   The court below refused to change the custody, and this court affirmed the judgment, holding that it was not an abuse of the discretion with which the judge was invested, and further ruling that such a contract, sustained as was this by a sufficient consideration in the entire cost of support, maintaining and care of the infant, which was incurred and borne by the uncle and aunt, was not revocable, except for sufficient legal reason.   In the head-notes of this decision, the court did say, " Large discretion is vested in the judge of the superior court in *habeas corpus* cases, and this court will not interfere with his judgment on law and facts, except it be manifestly abused," and in the judgment pronounced, "wide" is used instead of " large," but we apprehend that by the use of these qualifying adjectives, it was never the intention of the court to change or in the slightest degree to modify the nature or character of the discretion that we have seen must be observed in such cases, or to intimate that it was competent by the exercise thereof to impair or overturn the rights of parties as established by law. Indeed, when taken in connection with the context and the facts set out, those superadded words would seem to indicate no such purpose on the part of the court or of the judge delivering the opinion, and what is true of this case is true of the others therein cited.   *Lindsey vs. Lindsey*, 14 *Ga.*, 657, and *Boyd vs. Glass*, *ut supra.*  " Flagrant abuse of discretion," as used in each, means nothing more or less than a failure to follow plain rules of law, or to recognize rights clearly established by such law.   The case at bar and *Bently vs. Terry* seem to us as variant in their leading circumstances as two cases can be.

Taking the version of the plaintiffs in *habeas corpus* as true, and without any reference whatever to the respondent's account, it does not clearly appear that the respondent ever relinquished the cus-

tody of his child, or that he ever contracted to do so; it is wholly uncertain upon these vital points, and therefore there are no disputed facts upon which any conflict can arise, and which necessitate a resort to discretion in determining the dispute. While this is so, it is true beyond controversy that the respondent did supply food and raiment for his child, that he furnished medicine and medical attendance for it when necessary, and that he was looked to for and required by the grandmother, in whose care it was left, to do these things, and if the provision was not always as bountiful as she thought it should be, she sharply reproved him for his alleged shortcomings in what she esteemed his duty in this regard.

3. It is quite apparent that he stood somewhat in dread of her reprimand for failing to observe what she deemed her proper rule and right supremacy; and hence, to avoid a scene and painful controversy he resorted to a stratagem to get possession of his child, and place it under his own roof and in the midst of his family. This precaution to ward off an angry altercation, so far from being discreditable to him, and consequently detrimental to his rights, should place his conduct in a more favorable light than that in which it seems to have been viewed by these parties, and in which it would appear to have been regarded by the court. At all events, as explained by the letter addressed to his mother-in-law, it could not be construed into an acknowledgment that he was asserting by indirection an authority that he was conscious he did not possess.

4. The defendant's means of taking care of his child are more certain and ample than the means of those who would deprive him of her control. The grandmother is wholly destitute of means, and neither her husband nor son are under any obligation, which could be enforced at law, to appropriate their earnings to its rearing and nurture; the father can, if he fails voluntary, be forced by law to do this. The child is in the care of his mother and sisters, who are a part of his family, and who are shown to be in

every respect proper persons to direct her education and to be entrusted with her management. The plaintiffs seem not to regard them as socially their equals, and look upon them rather as their inferiors in point of culture and refinement, but this estimate of their character and fitness for this delicate trust is not borne out by others who have testified in the cause. The plaintiffs are evidently prejudiced against the defendant and his family, and if his child is committed to their exclusive care and management, there is danger, at least, that they may instill it with their prejudices and create aversion and distrust instead of the love and confidence she should habitually cherish for him, and which, according to the laws of both God and man, is his due.

5. She is now in a position where his intercourse with her can be more frequent and unrestrained than it has formerly been, and where he can support with less inconvenience and expense and more constantly overlook and direct her, and for her own welfare and interest, we think it is best for her to remain. She is in the custody that the law recognizes, and should, in our opinion, be suffered to continue, at least until some sufficient reason can be shown for removing her. We conclude that the discretion vested in the court was, to say the least, not exercised in a cautious, circumspect, and therefore in a legal manner, and so thinking, we order the judgment reversed.