NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1342.  VENTICINQUE v. LAIR.

LAND, Justice.

Krystle Venticinque appeals the trial court's order granting Amber Lair, her former romantic partner, joint legal custody and primary physical custody of Venticinque's biological minor child, L.V.  Among other things, Venticinque argues that the trial court erred in adjudicating Lair as an equitable caregiver of the child under OCGA § 19-7-3.1 and challenges the constitutionality of the Equitable Caregiver Statute.  For the reasons that follow, we vacate the trial court's order granting Lair equitable caregiver status, vacate the trial court's custody order, and remand this case to the trial court with direction to apply the correct legal standard under OCGA § 19-7-3.1.

1. The evidence presented to the trial court shows as follows.

Venticinque and her long-term romantic partner, Lair, lived together in Savannah. In 2018, the couple decided to start a family. They submitted photos of Lair to a sperm bank to select a sperm donor with similar features and determined that Venticinque would be the biological mother. Lair paid some of the fees related to Venticinque's fertility treatments. After Venticinque became pregnant, she planned a baby shower in which both she and Lair participated in a gender reveal and picked out items for a baby registry. Although Venticinque denied that she ever referred to Lair as L.V.'s mother, she sent Lair birthday cards and messages calling her "Mommy" and "Mama." The couple intended to get married,[1] for Lair to formally adopt the child, and for the child to have Lair's last name.

When the child, L.V., was born in July 2021, only Lair and Venticinque were present at the hospital. Lair was the first person to hold and feed L.V., and she took two weeks off of work after L.V.'s birth to care for him. After that, Venticinque stayed home with L.V.

---

[1] Although the couple was engaged for several years, they never married.

while Lair returned to work. Lair and Venticinque sent out cards announcing L.V.'s birth that referred to both women as his "proud parents." Venticinque also made multiple social media posts in which she tagged Lair and referred to L.V. as "our baby."

Witnesses, including Lair, testified at trial that Venticinque's personality changed after she delivered L.V. Venticinque began "sheltering" L.V. and herself from the outside world. In November 2022, when L.V. was 16 months old, Venticinque took L.V. to visit her family in Pennsylvania. Despite purchasing a return plane ticket, Venticinque did not return to Savannah.[2] Venticinque testified that she subsequently stopped all contact between Lair and L.V.

On December 18, 2022, Lair filed an action seeking equitable caregiver status of L.V. under OCGA § 19-7-3.1 (the "Petition"). Venticinque responded to the Petition and challenged the

---

[2] Venticinque testified that she left Lair due to abuse, that she felt "pressured" to refer to L.V. as a "Lair baby," and that Lair did not take on "full parent responsibility" with L.V., only changing "a handful of diapers and fe[eding] him a couple of times."

3

constitutionality of OCGA § 19-7-3.1. On March 27, 2023, the trial court held a hearing at which Lair, Venticinque, and a family friend testified. After the hearing, Venticinque filed a motion to dismiss Lair's Petition, again arguing that the Equitable Caregiver Statute, OCGA § 19-7-3.1, is unconstitutional. On June 12, 2023, the trial court issued an order denying Venticinque's motion to dismiss ("June 2023 Order"), finding that the Equitable Caregiver Statute is constitutional. Specifically, the trial court held that the Equitable Caregiver Statute is constitutional because it is narrowly tailored to limit the individuals who may seek equitable caregiver status and because it directly incorporates the "constitutional standard for evaluating harm to children" set by this Court in *Clark v. Wade*, 273 Ga. 587 (2001).

In the June 2023 Order, the trial court analyzed whether Lair satisfied the statutory requirements for equitable caregiver status, concluding that Lair had shown, by clear and convincing evidence, that she was "fully committed to taking a parental role" in L.V.'s life, had "engaged in the caretaking of the child, and established a bond

4

with the child," and had fully accepted parental responsibilities for L.V. "without expectation of financial compensation." The trial court then turned to the last statutory requirement, OCGA § 19-7-3.1(d)(5), stating that it was "next address[ing] whether *defendant* [Venticinque] has demonstrated that the child will suffer physical harm or long-term emotional harm if plaintiff's [Lair's] petition is granted, and whether continuing the relationship between plaintiff [Lair] and the child is in the best interest of the child." (emphasis added). "Considering the factors set forth in OCGA § 19-7-3.1(d)," the trial court awarded Lair equitable caregiver status of L.V. The trial court also awarded Lair temporary joint legal custody of L.V. and visitation time, with primary decision-making authority remaining with Venticinque.[3]

On August 14, 2024, when L.V. was approximately two years old, the trial court held a bench trial to determine custody, visitation, and child support, at which Venticinque and Lair both

---

[3] This Court declined to grant Venticinque's application for interlocutory review of the June 2023 Order.

testified. On November 1, 2024, the trial court issued an "Amended Final Order on Plaintiff's Petition for Custody, Visitation and Child Support," ("Amended Final Order") in which the trial court relied on OCGA § 19-9-3 in determining custody and visitation rights. In relevant part, the trial court granted the parties joint legal custody of L.V., with Lair having primary physical custody and Venticinque having visitation rights as set forth in the trial court's November 4, 2024 Parenting Plan ("Parenting Plan"). On November 26, 2024, Venticinque appealed the trial court's Amended Final Order and Parenting Plan to the Court of Appeals, which transferred the case to this Court pursuant to our jurisdiction over constitutional questions. See Ga Const. of 1983, Art. VI, Sec. VI, Par. II(1). This Court held oral argument in the case on October 21, 2025.

2. Among other things, Venticinque argues that the trial court erred in awarding Lair equitable caregiver status because it incorrectly placed the burden of proof on Venticinque to demonstrate that L.V. would "suffer physical harm or long-term emotional harm if [Lair's] petition is granted." Because we agree that the trial court

6

applied an incorrect standard and erroneously placed the burden of proof with respect to the issue of harm to the child on Venticinque, we vacate the trial court's equitable-caregiver and custody orders and remand the case to the trial court for application of the correct statutory standard. Because the constitutionality of the Equitable Caregiver Statute need not be decided until the trial court determines whether the statutory requirements have been satisfied, we do not reach Venticinque's constitutional challenge.[4] See *State v. Randall*, 318 Ga. 79, 81 (2024) ("Generally speaking, this Court will not reach novel constitutional questions when a case can be resolved without passing on such issues.").

Under the Equitable Caregiver Statute, a non-parent may seek rights including custody or visitation if the non-parent "proves that certain criteria have been met, including that he or she has

---

[4] Although Venticinque's briefing purports to raise both facial and as-applied constitutional challenges to the Equitable Caregiver Statute, Venticinque's counsel conceded during oral argument that Venticinque did not have a facial challenge to the Equitable Caregiver Statute. Because the trial court applied the incorrect legal standard, the Equitable Caregiver Statute was never properly applied to Venticinque and her as-applied challenge is not properly before this Court for review.

undertaken a 'parental' role with the child and developed a 'bonded and dependent' relationship with the child that 'was fostered or supported by a parent of the child.'" *Dias v. Boone*, 320 Ga. 785, 785 (2025) (quoting OCGA § 19-7-3.1(d)). The statute "provides both procedural and substantive requirements for an individual to establish 'standing to maintain the action' to be adjudicated as an equitable caregiver." Id. at 786 (quoting OCGA § 19-7-3.1(b), (d)).

Relevant here, OCGA § 19-7-3.1(d)(5) states that

> [i]n order to establish standing, the court shall first find, by clear and convincing evidence, that *the individual* has … [d]emonstrated that the child will suffer physical harm or long-term emotional harm and that continuing the relationship between such individual and the child is in the best interest of the child.

(emphasis added). In other words, "the statute requires *a putative equitable caregiver* to show by clear and convincing evidence that the child will suffer physical harm or long-term emotional harm" if the petition is not granted. *Dias*, 320 Ga. at 797 (cleaned up). See also id. at 786 (it is "the individual seeking equitable caregiver status" who "must establish by clear and convincing evidence each

8

of five statutory prerequisites"). Thus, the Equitable Caregiver Statute requires Lair, as the individual seeking equitable caregiver status, to demonstrate that L.V. will suffer harm if Lair's petition is not granted. It places no burden on Venticinque, the mother of L.V., to prove anything with respect to the issue of harm to the child.

The trial court's June 2023 Order, however, incorrectly placed the burden on Venticinque to demonstrate that L.V. would suffer harm if Lair were granted equitable caregiver status. See June 2023 Order at 6-7 ("The Court next addresses whether [Venticinque] has demonstrated that the child will suffer physical harm or long-term emotional harm if [Lair's] petition is granted[.]"). Accordingly, we vacate the trial court's June 2023 Order granting Lair equitable caregiver status and remand the case with direction to apply the correct standard under OCGA § 19-7-3.1.[5] Because we are vacating

---

[5] Because we are vacating the trial court's June 2023 Order granting Lair equitable caregiver status, we must also vacate the Amended Final Order and Parenting Plan, which are predicated on Lair's equitable caregiver status. See *Franklyn Gesner Fine Paintings, Inc. v. Ketcham*, 259 Ga. 3, 4 (1989) ("The legal effect of the reversal of a judgment on appeal is to nullify the judgment below and place the parties in the same position in which they were before judgment." (quoting *Kirkland v. Southern Discount Co.,* 187 Ga. App. 453 (1988))).

the trial court's orders on statutory grounds, we do not reach Venticinque's constitutional challenge to OCGA § 19-7-3.1 or her other enumerations of error. See *Randall*, 318 Ga. at 81.

*Judgment vacated and case remanded with direction. All the Justices concur.*

10

PETERSON, Chief Justice, concurring.

I concur fully in the Court's decision to vacate the trial court's orders and remand for the trial court to reconsider Lair's petition while properly putting the burden of proof on her as the putative equitable caregiver. I write separately to offer additional guidance for consideration of petitions under the Equitable Caregiver Statute — a statute that, as we noted in *Dias v. Boone,* 320 Ga. 785 (2025), raises significant constitutional concerns. In particular, I want to (1) reemphasize that every remedy under the Equitable Caregiver Statute must be tailored to the harm to the child caused by the parent's particular decision regarding the child's contact with an adjudicated equitable caregiver; (2) explain why the Equitable Caregiver Statute cannot evade that requirement by creating a new class of persons with the constitutional rights of parents; and (3) explain why the mere existence of the Equitable Caregiver Statute at the time of actions by a parent fostering or supporting a parent-like relationship between a child and a third party is insufficient to satisfy the requirement that any waiver of a constitutional right

11

must be knowing.

1. *Any remedy under the Equitable Caregiver Statute must be tailored to the harm to the child caused by the parent's particular decision regarding the child's contact with an adjudicated equitable caregiver.*

This is a case that presents serious issues about the nature of fundamental rights. Are they creations of government, such that government can change them? Or do they pre-exist government, such that constitutional protections are merely guarantees of rights that already existed? Certainly, at least some fundamental rights predate the United States Constitution. See *Ammons v. State*, 315 Ga. 149, 166 (2022) (noting distinction between "those rights which owe their existence to the Federal government, its National character, its Constitution, or its laws" and "other fundamental rights — rights that predated the creation of the Federal Government and that the State governments were created to establish and secure" (quotation marks omitted, quoting *McDonald v. City of Chicago*, 561 US 742, 754 (2010))). And the right of fit

parents to the care, custody, and control of their children is one of those, having "found recognition in the common law of England long before Georgia adopted the common law as our own[.]" *Dias*, 320 Ga. at 795.

Indeed, as we have explained, "parents have a fundamental liberty interest in the care, custody, and management of their children." *Clark v. Wade*, 273 Ga. 587, 593 (2001) (plurality opinion). See also *Nix v. Dept. of Human Resources*, 236 Ga. 794, 795 (1976) ("There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [her] offspring."). This "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 US 745, 753 (1982).

This "right of fit parents to the care, custody, and control of their children is secured by both the United States Constitution and the Georgia Constitution." *Dias*, 320 Ga. at 794–95 (citing *Troxel v.*

*Granville*, 530 US 57, 65 (2000) (plurality opinion); *Patten v. Ardis*, 304 Ga. 140, 143–44 (2018)). The United States Supreme Court has recognized the right as protected by the Due Process Clause of the Fourteenth Amendment. See *Troxel*, 530 US at 66. This Court recognized this right as early as 1858, see *Rives v. Sneed*, 25 Ga. 612, 622 (1858), and "we have since recognized that these principles are of constitutional dimension under the Georgia Constitution and may be embodied in Article I, Section I, Paragraph I, which guarantees due process, or Article I, Section I, Paragraph XXIX, which recognizes unenumerated, 'inherent rights' retained by the people." *Dias*, 320 Ga. at 795.

Our case law makes clear that interference with the fit legal parent's decision-making "requires a showing by clear and convincing evidence that the child will suffer harm from a fit parent's *particular decision* regarding the child's contact with a third party, and that the trial court's remedy be tailored to the harm caused by that decision." *Dias*, 320 Ga. at 798. See also *Patten*, 304 Ga. at 140, 144–45 (holding that grandparent-visitation statute

14

violated the Georgia constitutional right of parents to the care, custody, and control of their children because "it permit[ted] a court to set aside the decisions of a fit parent about what is best for his or her child, without clear and convincing proof that those decisions have harmed or threatened to harm the child"; non-parent visitation may not be imposed "over the objection of fit parents based simply on the best interests of the child, without a clear and convincing showing of actual or imminent harm to the child"); *Brooks v. Parkerson*, 265 Ga. 189, 193–94 (1995) ("The [United States] Supreme Court has made clear that state interference with a parent's right to raise children is justifiable only where the state acts in its police power to protect the child's health or welfare, and where parental decisions in the area would result in harm to the child. Likewise, … we find that implicit in Georgia cases, statutory and constitutional law is that state interference with parental rights to custody and control of children is permissible only where the health or welfare of a child is threatened. With the foregoing in mind, we find the [grandparent-visitation statute] falls short both in its

15

apparent attempt to provide for a child's welfare and in its failure to require a showing of harm before visitation can be ordered." (citations omitted)).

A person who satisfies the statutory criteria for adjudication as an equitable caregiver *may* be able to show that a child will suffer such harm if the relationship between the two is severed completely and the equitable caregiver is afforded no contact with the child. I can imagine such a scenario in which, notwithstanding a parent's constitutional rights, a court permissibly may override a fit parent's decision not to allow visitation between the parent's child and an equitable caregiver, on the basis that denying such visitation threatens serious emotional or mental harm to the child. But as we said in *Dias*, "it is difficult to conceive of a scenario in which a child will suffer harm due to a fit parent's decision to decline to share *legal custody* (as opposed to merely allowing some visitation or other contact) with a third party." 320 Ga. at 798. If the child's parent is fit, it seems difficult to show that a child will suffer the sort of harm that justifies State intervention by allowing that fit parent, rather

16

than a third party, to make decisions about the child's education, extracurricular activities, health, and religious upbringing.[6]

2. *The Equitable Caregiver Statute cannot evade the requirement to show harm from parental decisions before interfering with them by creating a new class of persons with the constitutional rights of parents.*

Notwithstanding this constitutional requirement of showing harm to the child before the State will interfere with a fit parent's decisions about their child, the Equitable Caregiver Statute "does not explicitly require trial courts to give deference to a parent's judgment as to the best interests of the child regarding visitation with a third party[,]" and "contains no presumption that it is in the best interests of a child to be in the custody of her legal parent."

---

[6] Venticinque argues that any "awards of visitation can only be such 'narrowly tailored' contact to serve the compelling state interest in protecting children from harm [and] thus contact must be in increments, such as phone calls, Zoom calls, a few hours monthly or less often, only as necessary, shown by clear and convincing evidence, to alleviate significant, long-term emotional harm." Although that *analytical* approach may be consistent with our case law, I recognize that an adjudicated equitable caregiver may be able to make a record that more fulsome interaction than Zoom calls is required to prevent serious emotional harm to the child.

*Dias*, 320 Ga. at 797. And the Equitable Caregiver Statute does not explicitly require that "relief awarded to an equitable caregiver be narrowly tailored to the harm or threatened harm that has been shown." Id.

Instead, the Equitable Caregiver Statute requires a putative equitable caregiver to show "standing" by establishing, among other things, "that the child will suffer physical harm or long-term emotional harm" — harm from what, the statute leaves unspecified — "and that continuing the relationship between [the putative equitable caregiver] and the child is in the best interest of the child." OCGA § 19-7-3.1(d)(5). The Equitable Caregiver Statute goes on to state that the trial court may afford someone "adjudicated" as an equitable caregiver "parental rights and responsibilities … including, but not limited to, custody or visitation." OCGA § 19-7-3.1(b), (g).

Understandably given this language, and given that the trial court here issued the relevant orders prior to the (admittedly limited) guidance we provided in *Dias*, the trial court appears to

18

have treated the legal parent, Venticinque, and the adjudicated equitable caregiver, Lair, as if they were both parents, as one would in the familiar context of a custody determination after divorce of two parents. The trial court referenced "the Solomonic task of assigning the custody of children," quoting an opinion in a custody matter in the context of a divorce. *Weickert v. Weickert*, 268 Ga. App. 624, 626–27 (2004). The court then went on to consider the factors typically used to determine custody in a divorce context, essentially rating both Venticinque and Lair on the various statutory criteria, including each person's "home environment," "knowledge and familiarity of the child and the child's needs," and "capacity and disposition … to provide the child with food, clothing, medical care, day-to-day needs, and other necessary basic care[.]" OCGA § 19-9-3(a)(3)(D)–(F). The trial court rated the parties "equal" on most of the statutory criteria, but found that two criteria, "past performance and relative abilities for future performance of parenting responsibilities" and "willingness and ability of *each of the parents* to facilitate and encourage a close and continuing parent-child

relationship between the child and the other parent," OCGA § 19-9-3(a)(3)(M)–(N) (emphasis added), were "more favorable" to Lair. Applying these criteria, the trial court awarded joint legal custody, with Lair having primary custody and tie-breaking decisional authority. That approach — although appropriate for a custody determination between two parents — cannot be squared in this context with the requirements of our caselaw. And to the extent that approach might be understood as permitted by the language of the Equitable Caregiver Statute, this highlights a significant constitutional problem with that statute.

When determining custody between two parents, both parents generally have the same constitutional rights. But in deciding issues of custody and visitation under the Equitable Caregiver Statute, a trial court is faced with a parent, who has the constitutional rights of a parent, and an equitable caregiver, who is not a parent and so does not have the constitutional rights of a parent. This is not to demean in any way equitable caregivers, who by definition will have "[f]ully and completely undertaken a permanent, unequivocal,

committed, and responsible parental role in the child's life[.]" OCGA § 19-7-3.1(d)(1).

Lair argues on appeal that it is proper to treat a parent and an adjudicated equitable caregiver as constitutional equals for purposes of determining custody under OCGA § 19-9-3, because "[o]nce the trial court bestows caregiver status, the courts should no longer view the case through the prism of parent and non-parent," as "[t]he equitable caregiver obtains parental status, no different than adoption." Serious constitutional concerns would arise if the statute clearly operated as Lair argues.

Placing the legal parent and the adjudicated equitable caregiver on equal constitutional footing — as the trial court apparently did here — presumes that the General Assembly has the power to create a new class of persons who enjoy the fundamental constitutional rights of a parent. I am skeptical that the General Assembly has such power; the nature of constitutional rights seems incompatible with the idea that a mere statute can create or expand

21

the meaning of a constitutional right.[7]

Lair posits that "[t]here are certainly scenarios in which there may be such significant harm to a minor child to permit a non-

---

[7] See *Regents of Univ. of Mich. v. Ewing*, 474 US 214, 229 (1985) (Powell, J., concurring) ("While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." (citation omitted)); *Minnesota Deer Farmers Assoc. v. Strommen*, 146 F4th 664, 671 (8th Cir. 2025) (statutory recognition of deer farming as an occupation does not render it a fundamental right; "A state statute cannot create a fundamental Constitutional right."); *Harrill v. Blount County*, 55 F3d 1123, 1125 (6th Cir. 1995) (state statute allowing arrestees opportunity to make a phone call promptly does not create a federal due process right; "A state statute cannot 'create' a federal constitutional right. Some state statutes may establish liberty or property interests protected by the Due Process Clause, but this statute creates neither a federally protected liberty or property interest."); *McKinney v. Pate*, 20 F3d 1550, 1556 (11th Cir. 1994) (en banc) ("[A]reas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause[.]"), abrogated on other grounds as stated in *Littlejohn v. School Bd. of Leon County*, 132 F4th 1232, 1240–41 (11th Cir. 2025). And absent establishing that the original public meaning of the relevant federal or constitutional provision protecting parent rights included the rights of someone who is not a biological parent and who did not assume parentage after the biological parent died or wholly waived those rights, e.g., by voluntary contract or abandonment, see OCGA § 19-7-1(b), a person does not receive any *constitutional* rights as a parent merely because a trial court has adjudicated them as an equitable caregiver under the statute. Cf. *Miller v. California*, 355 F3d 1172, 1176 (9th Cir. 2004) (recognition of grandparents as "'de facto' parents" under California law merely gave grandparents "an interest in the care of the child that is entitled to legal protection" and "the right to be present, to be represented and to present evidence in a dependency proceeding"; "de facto parents are not equated with biological parents" and that status "conferred no other, or weightier interest of constitutional dimension").

biological parent to obtain custody over their child," arguing that "fitness or unfitness of a parent is not always a binary and absolute conclusion, particularly when mental health is considered." Lair suggests that the Equitable Caregiver Statute allows an adjudicated equitable caregiver to obtain physical custody where a biological parent experiences "occasions" or "episodes" of unfitness, "while also preserving the biological parent's ability to exercise some parental rights when that parent is fit to do so." But the removal of a child from her parent's home due to parental unfitness, even temporary removal, is governed by Article 3 of the Juvenile Code, and contains elaborate procedural and substantive requirements for such removal that the Equitable Caregiver Statute does not begin to replace. See OCGA § 15-11-100 et seq.[8] And to the extent that Lair means to suggest that the Equitable Caregiver Statute merely provides a mechanism for identifying an alternative *placement* for a

---

[8] Moreover, the Equitable Caregiver Act specifies that the "adjudication of a person under this Code section as an equitable caregiver does not disestablish the parentage of any other parent." OCGA § 19-7-3.1(j). Whatever this means, at the very least it means that the statute does not provide a mechanism for removing a child from the custody of an unfit parent.

child taken into foster care consistent with the procedures set forth in Article 3, the legislation that enacted the Equitable Caregiver Statute did not also amend those pertinent provisions of Article 3. See Ga. Laws 2019, pp. 632, 632–36 § 1; see also OCGA § 15-11-135(c) (setting forth the only permissible foster care placement options, including among other places the home of the child's noncustodial parent, a relative, or fictive kin).[9]

Lair also suggests that an "[a]lternative[]" basis for affording primary custody to an equitable caregiver is found in the facts of this case, specifically Venticinque's contemptuous disregard of the trial court's June 12, 2023, order affording Lair visitation rights. But Lair does not seriously argue how Venticinque's resistance to the trial court's visitation order harmed the child, saying simply that the

---

[9] A person who meets the criteria for adjudication as an equitable caregiver under OCGA § 19-7-3.1 might also meet the definition of fictive kin, allowing for consideration as a possible foster care placement. See OCGA § 15-11-2(33) (defining "fictive kin" as "a person who is not related to the child by blood, marriage, or adoption but who prior to his or her placement in foster care is known to the family, has a substantial and positive relationship with the child, and is willing and able to provide a suitable home for the child"). But that also means that the Equitable Caregiver Statute does not serve a purpose in allowing such a foster care placement.

"trial court implicitly found that visitation for Lair was insufficient given Venticinque's continuous contempt" and "the trial court elected to transfer primary physical custody to Lair with significant visitation rights to Venticinque to satisfy the best interests of the child *while also balancing both parent's rights*." (Emphasis added.) If Lair means to suggest that the harm requirement was satisfied here because the child would be harmed without *contact* between Lair and the child, and transferring custody was the trial court's only available means for enforcing its order for such contact, Lair fails to appreciate that the trial court can enforce its visitation order through other means. The trial court may enforce its order through its contempt power; it does not need to resort to placing custody with the equitable caregiver in order to prevent any harm that might be caused by a lack of visitation between the equitable caregiver and the child. See OCGA § 15-6-8(5) (superior courts have the authority to "punish contempt by fines not exceeding $1,000.00, by imprisonment not exceeding 20 days, or both"). Indeed, the trial court here suspended a 20-day jail sentence for Venticinque's

25

contempt of its visitation order, "conditioned upon no subsequent violations of this [c]ourt's order as it relates to contact and all of the other provisions that the [c]ourt has put in place."[10]

All of this said, it seems clear to me that the statute — no matter what it might purport to *permit* — does not *prohibit* trial courts from applying the statute in ways that comport with applicable constitutional precedent. The statute plainly does not require trial courts determining what relief to award an equitable caregiver to deem that the equitable caregiver possesses rights equivalent to the parent's fundamental constitutional rights. And in the absence of such a requirement, trial courts should fashion relief under the statute understanding that the relief awarded must comply with our precedent limiting the State's interference with fundamental parental rights.[11]

---

[10] Venticinque enumerates no error in the process by which such contempt order was imposed here.

[11] For this reason, I am skeptical that OCGA § 19-9-3 is the appropriate legal framework to govern decisions about relief under the statute. OCGA § 19-9-3 assumes that it is governing custody decisions between parents, and states accordingly that there is not even a presumption in favor of either parent.

3.    *The mere existence of the Equitable Caregiver Statute at the time of relevant actions by a parent fostering or supporting a parent-like relationship between a child and a third party does not, without more, show a knowing waiver of a constitutional right.*

The requirement to ground any relief under the Equitable Caregiver Statute in a showing of serious harm to the child in the absence of such relief is based on the parent's constitutional right to the care, custody and control of her child. And we observed in *Dias* that even fundamental constitutional rights can be waived. See 320 Ga. at 799. Relying on this dicta in *Dias*, Lair argues that Venticinque "waived her right to exclusive parenthood." But Lair ignores critical caveats on that point in *Dias*. "In most contexts, a waiver of constitutional rights must be knowing, voluntary, and intelligent in order to be effective." Id. (citing cases). "And in order to be knowing and intelligent, a waiver must be done with sufficient

O.C.G.A. § 19-9-3(a)(1). And so the factors it outlines for consideration must be understood in that context. But fundamental parental rights require considerably more than a mere presumption in favor of the parent relative to third parties like equitable caregivers.

27

awareness of the likely consequences." Id.

Waiver could not have applied in *Dias*, because all of the conduct that might have supported waiver occurred before the effective date of the Equitable Caregiver Statute. Id. at 801–06. But nothing we said in *Dias* supports the idea that the mere existence of the Equitable Caregiver Statute can substitute for actual knowledge of the likely consequences of conduct that could constitute waiver. Lair argues that the law presumes that "every citizen knows the law."[12] But this presumption — although critical to our system in

_____

[12] Lair does not cite OCGA § 1-3-6, which provides: "After they take effect, the laws of this state are obligatory upon all the inhabitants thereof. Ignorance of the law excuses no one." Although this provision has been applied in a variety of contexts, it does not appear to stand for the proposition that we can presume a knowing waiver of a constitutional right from the mere existence of a Georgia statute. See, e.g., *Heywood v. State*, 292 Ga. 771, 778–79 (2013) (citing OCGA § 1-3-6 in rejecting argument that a validly enacted law takes effect for ex post facto purposes only after it has been added to the compilation of Georgia laws contained in the Georgia Code); *Cornell v. Camellia Corp.*, 248 Ga. 449, 450 (1981) (citing precursor to OCGA § 1-3-6 in concluding that civil defendant's ignorance of safety regulation would "not relieve [it] of [its] statutory duty"); *O'Callaghan v. Bank of Eastman*, 180 Ga. 812, 820 (1935) (citing precursor to OCGA § 1-3-6 in concluding that ignorance of the law does not suspend a statute of limitations). Nor can a statutory rule supplant the constitutional rule that waivers of constitutional rights must be knowing. See *Owens v. Hill*, 295 Ga. 302, 315 (2014) (acknowledging "the unquestionable rule that constitutional provisions take supremacy over legislative enactments when the two are in irreconcilable conflict and that the

many ways — is a legal fiction. No citizen — not even a single justice of this Court, or of the Supreme Court of the United States — actually knows all the laws. And the Supreme Court of the United States has long made clear that waiver of fundamental constitutional rights requires actual knowledge. See, e.g., *Brady v. United States*, 397 US 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *Johnson v. Zerbst*, 304 US 458, 464–65 (1938) ("[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and … we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that

---

judiciary has an independent, constitutionally-mandated role to ensure that the constitution is enforced when it is in conflict with a legislative enactment").

case, including the background, experience, and conduct of the accused. … The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights, and the guaranty would be nullified by a determination that an accused's ignorant failure to claim his rights removes the protection of the Constitution." (footnotes and quotation marks omitted)).

Lair primarily cites three cases in support of waiver, but none of them applies here. The first case, *Georgia v. Public.Resource.Org, Inc.*, 590 US 255 (2020), was about whether federal copyright law extends to annotations in Georgia's official annotated Code, and invoked the presumption that all citizens know the law merely as support for the necessity of statutes being available to the public. Id. at 265. The second case, *Gjerjaj v. Holder*, 691 F3d 288 (2d Cir. 2012) (per curiam), involved an asylum applicant's challenge to a waiver of the right to contest removal she signed as a condition of entry. She argued that she did not knowingly waive her rights to contest her removal. In rejecting that argument, the court noted that the asylum

applicant "was presumed to know the law and her rights when she read and signed the waiver," but the court also relied on its conclusion that she failed to present "any evidence … that she did not understand the language in which the document was written." Id. at 292. This case, of course, does not include a signed waiver.

And Lair actually undermines her argument in her citation to a third case, *Durden v. Johnson*, 194 Ga. 689 (1942). Lair cites *Durden* for the principle that Georgia law has long permitted a parent to give up parental rights by contract. And indeed, that has long been the law of Georgia. See OCGA 19-7-1(b)(1) ("Parental power shall be lost by … [v]oluntary contract releasing the right to a third person[.]"). But as long as that has been the law, Georgia courts have enforced significant safeguards around it. See *Miller v. Wallace*, 76 Ga. 479, 487 (1886) ("Where it is insisted that the father has relinquished his right to the custody of his child to a third person, by contract, which he might undoubtedly have done, yet the terms of the contract, to have the effect of depriving him of its control, should have been clear, definite and certain." (quotation

31

marks omitted)). This requirement that the terms of such a contract be clear, definite, and certain effectively prevent such a contract from being entered into without actual knowledge, and thus undermines Lair's argument. In short, nothing Lair cites stands for the proposition that the existence of the Equitable Caregiver Statute, by itself, establishes a parent's actual knowledge of the likely consequences of conduct that could constitute a waiver.

I am authorized to state that Justice Bethel joins in this concurrence.